1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| CITY OF OMAHA POLICE AND FIRE RETIREMENT SYSTEM Omaha/Douglas Civic Center 1819 Farnam Street, Suite 1004 Omaha, NE 68183, On Behalf of Itself and All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>    vs.<br><br>THE TIMBERLAND COMPANY 200 Domain Drive Stratham, NH  03885<br><br>JEFFREY B. SWARTZ, 29 Merrill Road Newton Center, MA 02459-1320<br><br>SIDNEY W. SWARTZ 1001 S. Ocean Blvd. Delray Beach, FL  33483<br><br>CARRIE W. TEFFNER 23 Caverno Drive Lee, NH  03861<br><br>                  Defendants. | No. 1:11-cv-00277-SM<br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**NATURE OF THE ACTION**

1.       Court-appointed Lead Plaintiff, City of Omaha Police and Fire Retirement System, ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's amended complaint against Defendants (the "Complaint"), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by The Timberland Company ("Timberland" or the "Company"), as well as media reports about the Company and conference call transcripts and interviews with former Timberland employees and other knowledgeable sources.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**INTRODUCTION AND SUMMARY OF THE ACTION**

2.       This is a securities class action on behalf of persons who purchased the common stock of Timberland between February 17, 2011 and May 4, 2011, inclusive (the "Class Period") seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

3.       Timberland was a family-owned and controlled company and remained so after it was taken public in 1987.  As of June 2011, immediately before Timberland's acquisition by VF Enterprises, Inc. ("VF"), the Swartz family controlled 73.5% of Timberland's stock.

4.       Nathan Swartz began manufacturing leather boots in 1917.  In 1946 he joined Timberland's predecessor, took it over in 1955, and renamed it Timberland in 1978.  Along the way, his son, Defendant Sidney Swartz, joined the Company and very successfully commercialized Timberland's iconic waterproof yellow boot which was introduced in 1973.  Timberland sold its boots and other products through its own retail stores and factory outlets, and through major "wholesalers" in three business segments - North America, Europe and Asia.

5.       In 1986 Sidney's son and Nathan's grandson, Jeffrey Swartz, joined Timberland.  In his own words, Jeffrey had nearly bankrupted the Company by the early 90's.  Yet in 1998 Sidney turned over the reins to Jeffrey.  And, because the Swartzes owned a controlling interest in

Timberland, Jeffrey Swartz, as a practical matter, answered to nobody but his father, who, for all times relevant to the Complaint, served as Timberland's Chairman of the Board and exercised ultimate authority for the false and misleading statements alleged in the Complaint.

6.      VF, whose other fashion and accessory brands included Vanity Fair, Lee, Wrangler, The North Face, Nautica, and JanSport, in particular had been expressing an interest in adding Timberland to its panoply of brands for more than a decade.  In 2010 Jeffrey Swartz quietly began serious efforts to sell Timberland.  In December 2010 the Timberland Board of Directors hired investment bankers to shop the Company, and VF, along with another suitor, expressed a strong interest in acquiring Timberland.  But the Company's then stock price which hovered in the mid-$20's would not support the numbers the Swartz family had in mind.

7.      The Swartzes knew they had to improve the investing public's perception of Timberland's earnings performance and growth rates to boost Timberland's stock price and obtain a higher offer from VF.  This was accomplished by managing Timberland's fourth quarter 2010 ("4Q 2010") revenue and earnings, and growth trends, so that the Company's prospects appeared far better than they were.   Under Timberland's revenue recognition practices, Timberland generally recognized sales revenue when it delivered its products to its wholesalers, what in the industry was known as "sell-in" sales.  Revenues were "pulled forward" and included in Timberland's 4Q 2010 earnings, by "stuffing the channel" thereby robbing future quarters of "sell-in" sales, which would otherwise have occurred in the later quarters.  4Q 2010 earnings were also inflated by deferring the recognition of expenses whose timing Defendants could control, and expenses, such as for advertising, and for product costs included in inventory, that properly should have been written down and expensed.

8.      Thus, on February 17, 2011, Defendants announced a remarkable and unanticipated shift in the Company's year-over-year financial results, which Defendants emphatically portrayed as being indicative of its long-term performance and stock value.

9.      During the Company's February 17, 2011 earnings conference call, Jeffrey Swartz emphasized the "real progress Timberland ha[d] made over the last year," stating that "[w]ith four

1    successive quarters of brand right growth, ***2010 marks the moment when Timberland's shifted from***

2    ***playing defense to playing offense."*** [Emphasis added.][1]

3        10.    Discussing    purportedly    then-current    ***"trends    and    strategy    in [Timberland's]***

4    ***regions,"*** Jeffrey Swartz emphasized on February 17, 2011, that he was "very pleased, very pleased

5    to report ***positive momentum*** from the Timberland branded business in North America, ***with revenue***

6    ***up for 2010 and up double digits in the fourth quarter,"*** noting "North America was ***returning to***

7    ***profitable growth*."  Indeed, the numbers Defendants posted as of that day showed that overall the

8    profits for 4Q 2010 had grown a striking 89% over fourth quarter 2009 ("4Q 2009").

9        11.    Chief Financial Officer ("CFO") Carrie W. Teffner ("Teffner") reinforced Jeffrey

10   Swartz's account of Timberland's then-current trends, stating the Company and its executives were

11   "pleased to be able to report ***real strength and momentum in [its] business*."  Emphasizing the

12   tremendous sales and profits growth during 4Q 2010, Teffner stated Timberland and its executives

13   "fe[lt] strongly that these results show[ed] that ***[they] [could] deliver profitable growth*** as [they]

14   buil[t] [their] business to be the number one outdoor brand on earth."

15       12.    To explain away what appeared on its face to be a troubling increase in unsold

16   inventory, Swartz touted the Company's anticipated continuing trend in wholesale orders, or

17   "backlog," and thus expected sales growth in early 2011.  According to Swartz at the February 17,

18   2011 earnings conference, the first and third quarters were typically "sell-in quarters," and the fourth

19   was a "sell-through" quarter, *i.e.*, where wholesalers sold Timberland products to consumers, and

20   meaning that with wholesale revenue purportedly increasing by 31% in a fourth quarter, first quarter

21   2011 ("1Q 2011") wholesale revenues should also be expected to be robust.  Concerning purportedly

22   then-current inventory levels, Teffner acknowledged that total inventory had increased 14% year-

23   over-year, but emphasized that the Company's "level of excess inventory" had actually "declined as

24   a percentage of inventory compared to the fourth quarter of 2009."  Later in the call, in response to

25   an analyst's question regarding how Timberland and its executives felt about its "inventory position

---

27   [1]        Emphasis is added unless otherwise noted.

1  right now," Teffner again confirmed they felt "pretty confident with the inventory position right

2  now."

3  　　　　13.　Concerning how Timberland's sales trends were shaping up in the first half of 2011,

4  Jeffrey Swartz stated "when you look at our backlog coming into this year, Carrie talked about

5  inventory up 14%.  That's good in the context of a **backlog that's up 19%, double-digit increases in**

6  **every one of the regions**." Characterizing this metric as an "indication that's obviously, principally

7  an H1 reality, because we're just beginning the fall selling," Swartz emphasized that "**indications**

8  **are that as we performed at retail, we have the right – it's ours to lose.  It's ours to capitalize on**

9  **the momentum that we've created with retailers.**"

10  　　　　14.　Responding to an analyst's request that Jeffrey Swartz confirm previous predictions

11  that **through "expense management and trying to improve the brand,"** he "expect[ed] fully to

12  return to 15% operating profit growth," **Jeffrey Swartz emphatically confirmed that "15%**

13  **operating income is exactly the kind of result that we're accountable for,"** emphasizing that

14  Timberland and its executives were then **"making progress in that direction"** and that Jeffrey

15  Swartz was **"not going to back away from the goal."**

16  　　　　15.　However, as of February 17, 2011, Defendants knew that Timberland's wholesale

17  accounts did not have the "sell through" to consumers to warrant these sunny predictions, and that

18  planned increases in operating expenses would devastate the Company's margins.  As Teffner, the

19  Company's CFO, explained at Timberland's 1Q 2011 earnings call, we "deliberately chose to

20  increase advertising spend in the first quarter . . . in order to take advantage of the strong sell-in from

21  year end."

22  　　　　16.　Defendants' February 17, 2011 statements were false, misleading and/or misleadingly

23  incomplete because:

24  　　　　　　　　(a)　Defendants then knew that Timberland's 4Q 2010 earnings had been managed

25  to pump up its earnings trends and stock price and thereby strengthen their negotiating position with

26  VF;

27  　　　　　　　　(b)　Defendants then knew that the purported sales "momentum" the Company

28  experienced in 4Q 2010 that led to extraordinary sales growth and increased earnings that quarter

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4

would grind to a halt in 1Q 2011 when the consequences of the earlier quarter's channel stuffing and earnings management were felt; and

(c)     Defendants then knew that, based on their decision to increase 1Q 2011 advertising spending and inventory write downs, the Company was not at all "making progress in [the] direction" of a 15% operating margin growth.

17.     Yet, based on the Company's extraordinary and unanticipated financial performance in 4Q 2010, *coupled with Defendants' bullish statements about the purportedly then-present sales and earnings trends, cost discipline and inventory levels and an anticipated return to a 15% operating profit*, the Company's stock price surged 30% in a single trading session on February 17, 2011, closing at $35.93 per share, *a 52-week high*, with more than four million shares changing hands that day.

18.     As emphasized by the *Associated Press*, the uptick was attributable to the belief fostered by Defendants among the investment community that in the 4Q 2010, Timberland's "*demand increased worldwide*, particularly for the company's shoes."

19.     Reiterating Defendants' bullish mantra, Susquehanna analyst Christopher Svezia characterized Timberland's ongoing "revenue momentum [as] strong," stating "[l]onger-term," *"the brand continues to recover from a sales drop during the recession,"* and that *"[t]he company appears to be firing on all cylinders moving into 2011 with virtually all categories, regions and channels expected to show growth next year."* Svezia kept his "Positive" rating on the stock and increased his price target by $9 to $41.

20.     *The Wall Street Journal* too reported that "Timberland Co.'s *fourth-quarter profit jumped 89% as revenue surged* amid robust growth in global same-store sales," reporting that "[t]he footwear company, which specializes in boots and outdoor apparel, *saw broad growth*."

21.     Based on Defendants' bullish February 17th statements, on February 18, 2011, *Bloomberg* reported that Citigroup too had raised its price target for Timberland to $38 per share from $27 per share, emphasizing that "EPS estimates were revised upwards to $2.50 from $1.75 vs. consensus estimates of $1.74 for 2011, and to $2.90 from $2.00 vs. consensus estimates of $2.45 for 2012."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

22.     Additionally, on February 18, 2011, Longbow Research's Jonathan Grassi issued a report increasing his valuation of Timberland's stock to $38.36 per share, emphasizing, based on Defendants' positive comments, that: ***"We believe that TBL's strategic execution in rejuvenating the brand is beginning to pay dividends."*** Concerning Timberland's growth prospects based on Defendants' February 17, 2011 statements, Grassi emphasized:

> FY11 Outlook. ***TBL top-line looks very well-positioned relative to previous years following a strong finish to 2010 and an optimistic outlook for FY11's revenue growth potential given a backlog order book that is up 19% (orders for 1H11) with clear momentum in Earthkeepers and demand for the classic boot internationally***. We expect gross margins will continue to be pressured in 1H11 as TBL has implemented limited price increases and is faced with higher leather, labor and transportation cost. Product cost inflation is expected to escalate heading into 2H11, ***but price increases are expected to offset a significant portion of the higher cost***.
>
> ***Adjusting FY11 Estimates.*** We are ***increasing our FY11 EPS from $1.67 to $2.26 as we have become more aggressive with our top-line growth expectations for the company following improved demand for the classic boot business internationally and growing demand for Earthkeepers.*** Our 12% top-line growth expectations for TBL in FY11 is partially offset by gross margin compression of 190bp from product cost inflation.

23.     Thereafter, on February 26, 2011, Timberland issued (and filed with the SEC) its fiscal 2010 Annual Financial Report to Shareholders on Form 10-K, which was signed by each of the Individual Defendants.  In addition to republishing the Company's 2010 financial results reported on February 17, 2011, the 2010 Annual Report contained a letter to shareholders and would-be investors signed by Jeffrey Swartz which emphasized in relevant part:

> ***2010 marked an important turning point for Timberland.*** With brand-right top line growth, strong earnings increases, and a rock-solid balance sheet, ***2010 was the culmination of disciplined focus on our business and targeted investments in our brand***. We grew revenue across North America, Europe, and Asia. We grew Classics, Earthkeepers®, and Outdoor Adventure. We grew men's, women's, and kids'. We grew our retail footprint and our comparable store sales. We grew footwear, apparel, and accessories. ***As our progress shows, we have the right strategy and the right team in place to grow Timberland into the number one outdoor brand on Earth.***
>
> At the heart of our performance is a uniquely Timberland® brand story of authenticity, sustainability, and deep roots in the New England outdoors. Authenticity runs throughout our products, but is especially evident in our Classics category, the foundation of our brand and our business. ***In 2010, our global Classics***

*business returned to growth, and helped to provide a stable foundation for our key growth initiatives.*

2010 was a breakthrough year for the product line at the center of our growth strategy: Earthkeepers®. With annual sales increases in the triple digits in every region and across all genders, Earthkeepers® not only grew our business, but also served as a platform for breaking through with women, a huge growth opportunity for Timberland. Nowhere is our brand's commitment to sustainability more clear than with Earthkeepers®, a unique combination of beautiful and rugged, outdoor-capable product, built with green materials and green processes.

*In North America, big ideas like Earthkeepers® and Outdoor Adventure helped to revitalize our brand and spurred positive annual revenue growth in the region for the first time in several years.* Europe continued to produce strong results, with men's, women's and kids' revenue up double digits across consumer direct and wholesale channels. Asia also turned in an impressive performance, with growth in every country, including China, where revenue more than doubled.

2010 was many years in the making. Our strong revenue and earnings growth was built on a resurgence of brand momentum globally—momentum that was created through a relentless commitment to telling our story.  But our journey is not complete. 2010 was one step along Timberland's path to becoming the number one outdoor brand on Earth. And we'll continue to travel that path until we've reached our destination.



**Jeffrey B. Swartz**

President and Chief Executive Officer

24.  On February 17, 2011, Jeffrey Swartz immediately cashed in on the price inflation his bullish statements and forward guidance had caused, selling more than $6 million of Timberland stock into the public market.  These sales were unusual both in timing and amount as Jeffrey Swartz had not publicly sold Timberland shares in years, as his family's controlling stock ownership of Timberland provided it with substantial control over the Company's operations and Swartz's and his father's livelihoods.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

25.     Even more importantly, however, Defendants' bullish and misleading statements impelled the sales negotiations with VF forward.  On February 18, 2011 the Company contacted Goldman Sachs to act as its financial advisor.  Days later, Swartz and Teffner met with VF to discuss the Company's finances as part of its due diligence.  To support the Company's negotiating position, Timberland's earnings forecasts provided to VF were "revised" in February 2011 to take account of its newly announced 2010 financial results and trends.  Later, however, in the merger statement describing shareholders' appraisal rights, Defendants admitted that, in fact, on March 3, 2011, Sidney Swartz had warned the Board, "about the difficulty in attaining Timberland's long term operational plans in light of prior years' results."

26.     Even as evidence grew that Defendants' portrayal of Timberland's performance and prospects had been false and misleading, Defendants failed to correct their statements, and analysts following Timberland's stock continued to recommend it to investors.  Thus, *e.g.*, on March 30, 2011, *CNBC* published a report entitled "***Off the Charts***," which explained that "Timberland hit a 52-week high and has gained more than 60 percent. A look at whether investors should step in, with Christopher Svezia, Susquehanna Financial Group analyst."  *CNBC*'s March 30th report quoted Svezia as stating: ***"product is really beginning to resonate with consumers"*** – in 2010 "Earthkeepers began to take off and explode" –  ***"very strong sell-through"*** – ***"starting to see strength in core Timberland business"*** - ***"footwear business in US has seen a resurgence"*** – ***"we project Q1 Revenues up 14.4%"*** – "operating margin perspective still off peak" – ***backlogs up 19% coming out of year"*** – "ranked with Deckers and #3 and #4 in shoe industry."

27.     As late as April 29, 2011, Susquehanna's Svezia reiterated his "Positive" rating on Timberland's stock, announcing the Company would release 1Q 2011 results on May 5th and stating, based on his own analysis and Defendants' bullish statements, that Susquehanna now placed a value on Timberland's stock of $45.30 per share.

28.     As the market continued absorbing Defendants' bullish statements and forward guidance, the Company's stock price continued to spiral up, reaching a Class Period high of $45 per share by April 29, 2011.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

29.     Defendants' earnings management and false and misleading portrayal of the Company's prospects had permitted them to negotiate a sale of Timberland to VF for $43 per share. At that price, Sidney Swartz and the Swartz family trusts *stood to gain more than $495 million* – almost half a billion dollars – for their Timberland shares.  Jeffrey Swartz and Carrie Teffner could cash in their Timberland stock options and warrants for tens of millions more.  *Based on Defendants' efforts to increase VF's and the investing public's perception of Timberland's value in February 2011, each of the Defendants obtained 60% more than they would have had the Company been sold based on the market's perception of its worth in December 2010.*

30.     But Defendants' efforts worked too well.  By April 2011, the market price for the Company's stock was approaching and then exceeded the $43 sale price to VF, and VF – *having, by then, reviewed Timberland's books and records as part of its due diligence efforts* – was simply not willing to pay a penny more for the Company.  As the Company's merger statement reflects, as of March 29, 2011 VF was demanding deal terms that permitted it to walk away from the purchase, if 10% or more of Timberland's stockholders elected to exercise their "appraisal rights," and secure higher payments for their stock, under Delaware law.  On April 4, 2011, Jeffrey Swartz met with the Board and described "his concerns, in light of Timberland's stock price," which had risen above VF's offer.  Thus, the deal was called off, and negotiations were officially terminated, until after the sobering truth about Timberland was announced in connection with the Company's 1Q 2011 results.  Negotiations were resumed only after the Company's May 26, 2011 annual meeting with shareholders.  Later that day, "following the Annual Meeting," Swartz and its deal counsel and Goldman Sachs met to "recommence" negotiations.

31.     On May 5, 2011, Defendants had shocked the market, and driven down Timberland's stock price, by disclosing Timberland's actual 1Q 2011 financial results, for the quarter ended March 30, 2011, that sharply conflicted with Defendants' sunny presentation on February 17, 2011:

- Instead of a 25.7% increase in sales over the prior year as achieved in 4Q 2010, in 1Q 2011 sales grew only 10% over the prior year;

- "Advertising was up 30% in the quarter";

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

9

- Due to "strategic purchases of core product" during 1Q 2011, "[i]nventory at quarter end was $186.9 million, *an increase of 36.5%*"; and

- Operating income was "*down 29.2%* compared to operating income" in 1Q 2010.

32.     The Company's 1Q 2011 Form 10-Q reported that "unallocated corporate expenses" had increased 15.8% to $30.5 million for, among other things, "inventory cost variances and adjustments to standard costs."

33.     As a result, where 4Q 2010 profits had *"jumped to 89%"* over the prior year, 1Q 2011 net income actually *declined 25% year-over-year to $18 million, to $0.35 per diluted share,* compared with net income of $25.7 million, or $0.47 per diluted share in 1Q 2010.  These reports led the investment community to overhaul its views of the Company and to question its management's credibility.

34.     According to *Bloomberg's* May 5th early morning report, Timberland's stock "fell the most in the Russell 2000, sinking 27 percent to $30.21."  Even Susquehanna, Timberland's long time booster, while questioning whether the one-day 26% stock drop was excessive, reported "increased expenses and a miss on revenue *will draw into question the credibility factor with management and thus reduce the multiple in the near-term*."  As a result, Susquehanna reduced its price target from $45 to $38 per share.

35.     During the conference call held May 5, 2011, Jeffrey Swartz admitted that rather than experiencing a strong recovery and sales momentum in the Company's signature "classic boot," sales of the "yellow boots" that had been the staple of Timberland's brand "continue[d] to be a soft business," and noted that with this critical product, "we had to clean up the mess that we created." Instead, Jeffrey Swartz said he was hoping to replace those declining sales with sales of "boat shoes" and other warm-weather wear.  Teffner admitted that *backlog had shrunk to 16% in the quarter*, a particularly glaring statistic as the Company's product costs reflected in Timberland's inventories *increased 36.5%* -- suggesting that future margins would be even lower as these costs were expensed and reported in earnings.  She also admitted to managing expenses to fall in 1Q 2011.  ("Just to be clear, we deliberately chose to increase advertising spend in the first quarter, a relatively quiet quarter for us normally, in order to take advantage of the strong sell-in from year end.")  Contrary to

the bullish message Defendants delivered on February 17, 2011, Jeffrey Swartz admitted that in January and February, on both a "wholesale basis" and in retail, we "were positioned to serve demand, and it wasn't there."  As the Complaint's confidential witnesses described, however, none of this would have come as a surprise, because management received "comps" from its major wholesalers on a weekly basis describing their "sell through" of Timberland products to consumers during the Christmas season and thereafter.

36.     With the revelation of the truth about its true product demand, structural margins trends and growth, Timberland's stock plummeted $11 in a single trading session, or 27%, to close at $30.65, *the biggest decline its stock had experienced in 23 years*, on unusually high volume of more than five million shares trading. ***When the dust settled, more than $116 million in market capitalization had simply vanished.***

37.     ***But – as Defendants knew they would – VF immediately offered to make good on its promise to acquire Timberland at $43 per share***, and now the Board was able to publicly report what Sidney Swartz had told them in the first week of March as the reason the VF merger should be approved -- "the difficulty in attaining sustained growth in earnings and revenue in light of prior years' results and the ability to achieve its long range operational plan in light of anticipated rising costs and increased pressure on margins. . . ."  The sale to VF was announced in June 2011, and the description of the deal and its negotiations were described in a merger statement filed on August 24, 2011, in connection with the exercise by the public minority shareholders of their appraisal rights.

38.     Defendants' management of earnings and manipulation of public investors' perceptions of Timberland's true value caused huge losses to its public investors, particularly to those who sold their stock before the unexpected June 2011 announcement of the sale to VF. Because Timberland's stock price had been pumped up so high during the Class Period, even investors who were able to obtain the benefit of VF's $43 offer, which contained a significant control premium, suffered losses as a result of Defendants' fraudulent scheme.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**JURISDICTION AND VENUE**

39.    The claims asserted herein arise under §§10(b), 20(a) and 20(A) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5.   Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

40.    Venue is proper in this district pursuant to §27 of the Exchange Act.   Acts and transactions giving rise to the violations of law complained of occurred in this district.

**THE PARTIES**

**Plaintiff**

41.    Plaintiff, City of Omaha Police and Fire Retirement System ("Omaha Police"), purchased Timberland common stock during the Class Period as described in the Certification affixed as Exhibit A to its Complaint filed on June 3, 2011.  Omaha Police purchased its stock at prices inflated by the fraud alleged herein, and suffered losses as a result of, and following the revelation of the truth.  Like many other Class members, Omaha Police sold all of its Timberland stock after the May 5, 2011 disclosures, when the truth concerning Timberland's business metrics and financial prospects were made public, but before the VF acquisition was announced.  Omaha Police was appointed lead plaintiff by order of this Court entered October 14, 2011.

**Defendants**

42.    Defendant Timberland, headquartered in Stratham, New Hampshire, designs, develops, markets, and distributes footwear, apparel, and accessories products for men, women, and children in North America, Europe, and Asia. During the Class Period, Timberland had over 41 million shares of common stock outstanding, which shares traded in an efficient market on the NYSE under the ticker symbol "TBL."   Timberland was followed by stock analysts and was constantly in communication with the markets and investors in quarterly conference calls and frequent presentations to investor and analyst conferences. Timberland also filed periodic public reports with the SEC, and regularly issued press releases to the financial press.   Financial information about Timberland was widely distributed.   After this securities fraud class action was commenced, on June 12, 2011 the Timberland Board of Directors agreed to an acquisition of all of the Company's stock by VF Enterprises, Inc. ("VF") for $43 per share in a transaction that closed

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

12

1    September 13, 2011. On September 22, 2011, the Company notified the SEC it would cease

2    reporting under §12(g) of the Exchange Act.

3         43.    Defendant Jeffrey B. Swartz ("Jeffrey Swartz") was, during the Class Period,

4    President, Chief Executive Officer ("CEO") and a director of Timberland, having joined the

5    Company in 1986.  In June 1998, Jeffrey Swartz assumed the roles of President and CEO from his

6    father, Sidney W. Swartz ("Sidney Swartz").  Jeffrey Swartz's grandfather, Nathan Swartz, founded

7    the Company.  During the Class Period, Jeffrey Swartz ran Timberland as a "hands-on" manager

8    dealing with important issues at the Company, including brand development, marketing Timberland

9    products, inventory sourcing and management, and sales of Timberland's products.  Jeffrey Swartz

10   was one of the people with "ultimate authority," and made the material false and misleading

11   statements and omissions described herein, including those made on the February 17, 2011 earnings

12   call.  Jeffrey Swartz was intimately knowledgeable about all aspects of Timberland's business

13   operations, as he received daily reports and had ready access to Timberland's computerized systems

14   containing up-to-date information regarding Timberland's retail and wholesale sales, including

15   wholesalers' "sell through" of Timberland products, product demand, advertising spending and

16   inventory.  Jeffrey Swartz was also intimately involved in the preparation of Timberland's financial

17   statements and guidance, including the amounts of backlog, inventory and what disclosures would be

18   made, and the functioning of Timberland's internal financial, accounting and disclosure controls. He

19   reviewed, approved and signed Timberland's SEC filings and its Sarbanes-Oxley certificates,

20   including the February 22, 2011 Sarbanes-Oxley certificates that were filed with the SEC on

21   February 26, 2011 with Timberland's 2010 Annual Report to Shareholders.  Jeffrey Swartz also

22   negotiated the sale of Timberland to VF, and managed Timberland's earnings and manipulated its

23   stock price to support that effort.  On February 17, 2011, the first day of the Class Period, Jeffrey

24   Swartz sold 170,000 shares of Timberland stock at artificially inflated prices while in possession of

25   material non-public information, receiving more than $6 million in proceeds.  These sales were

26   suspicious and unusual both in terms of timing and amount and wholly inconsistent with Jeffrey

27   Swartz's past practices of not having sold any Timberland stock over at least the preceding five-year

28   period (if ever).

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

44.     Defendant Sidney W. Swartz ("Sidney Swartz") was, during the Class Period, Chairman of Timberland's Board of Directors and had been since June 1986.  Sidney Swartz also served as the Company's CEO and President from June 1986 to June 1998.  Though Sidney Swartz had relinquished the CEO role to his son, he remained one of the persons at Timberland with the "ultimate authority," and thus "made" the material false and misleading statements and omissions described herein.  According to the Company's 2011 Annual Proxy Statement to Shareholders, Sidney Swartz continued managing Timberland and instead of receiving a director's stipend, Sidney Swartz received an annual cash salary of $500,000 and other financial perks, "including personal use of Company-owned aircraft, … payment of tax services provided by a tax advisor [and] Company-paid personal travel and product purchases."  Sidney Swartz, individually and through the Swartz family trusts, also controlled Timberland and the remaining Defendants, through the more than 70% of voting power of the Company's outstanding voting stock.  According to Defendants' own admissions in the Company's 2011 Proxy Statement, Sidney Swartz "controlled" Timberland.  During the Class Period, Sidney Swartz was intimately knowledgeable about all aspects of Timberland's business operations as he received daily reports and/or had ready access to Timberland's computerized systems containing up-to-date information regarding Timberland's own retail and wholesaler sales, including wholesalers' "sell through" of Timberland's products, product demand, advertising spending and inventory.  Sidney Swartz also reviewed, approved and signed Timberland's SEC filings filed during the Class Period, including having signed the letter accompanying the 2011 Proxy Statement sent to Timberland shareholders on April 12, 2011 for the FY 2011 annual shareholder meeting.  As Timberland's Chairman of the Board, Sidney Swartz knew of his son's earnings management and stock price manipulations made in connection with the sale of Timberland to VF.

45.     Defendant Carrie W. Teffner ("Teffner") was, during the Class Period, Vice President and Chief Financial Officer ("CFO") of Timberland, having joined the Company in 2009.  During the Class Period, Teffner ran Timberland as a "hands-on" manager overseeing Timberland's finances and accounting and participating in the February 17, 2011 earnings conference call, and was one of the people with "ultimate authority" and made the material false and misleading statements

1    described herein.  Teffner was intimately knowledgeable about all aspects of Timberland's business

2    operations, as she received daily reports and had access to computerized information regarding sales,

3    costs and expenses, product demand, advertising spending and inventory.  Teffner was also

4    intimately involved in the preparation of Timberland's financial statements and earnings guidance,

5    including determining the amounts of backlog, inventory and what disclosures would be made, and

6    the functioning of Timberland's internal financial, accounting and disclosure controls.  Teffner

7    prepared, reviewed, approved and executed Timberland's SEC filings and its Sarbanes-Oxley

8    certificates, including the February 22, 2011 Sarbanes-Oxley certificates that were filed with the

9    SEC on February 26, 2011 with Timberland's 2010 Annual Report to Shareholders.  Teffner's

10   compensation was highly weighted toward stock warrants, options and restricted stock units,

11   incentivizing her to inflate the Company's stock price in the process of selling Timberland to VF.

12   For instance, for FY 2010, Teffner received almost $1 million in compensation from Timberland,

13   only $342,500 of which was paid in a cash salary and none of which was paid in the form of a cash

14   bonus.  Instead, the bulk of Teffner's FY 2010 compensation was comprised of $135,372 in

15   restricted stock awards, $91,714 in stock options and $389,996 in restricted stock units.  Similarly,

16   for FY 2009, of the $632,236 Teffner received in total compensation, $174,100 was paid in restricted

17   stock awards, $209,798 was paid in stock option awards and $75,785 was paid in restricted stock

18   units.  Upon completion of the sale to VF, Teffner stood to receive $2,366,612 on the immediate

19   vesting and payout on her stock options and restricted stock units, $977,882 in tax reimbursement,

20   $36,062 in other perquisites and a lump-sum cash payout of $1,499,992 as severance, or a total of

21   $4,880,548.[2]

22

23

24

25
_____

26   [2]     According to the Company's 2011 Proxy Statement, Teffner's change in control agreement
      would not legally entitle her to any payment if she voluntarily terminated employment with
27   Timberland during the thirteenth full month following a change in control.

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1            **BACKGROUND TO THE CLASS PERIOD**

2    **Timberland is Founded**

3           46.     Timberland founder Nathan Swartz started manufacturing leather boots in 1918,

4 eventually taking over in 1955 the Abington Shoe Company, which had been incorporated in

5 Massachusetts in 1933. In the 1960s, Nathan's son Sidney Swartz pioneered the concept of

6 waterproof boots, launching the Company's iconic "yellow boot" in 1973. Given the success of its

7 waterproof boot, the Timberland, the Swartzes renamed the Company Timberland in 1978 and took

8 it public in 1987. The Company's iconic yellow boot enjoyed strong patronage from consumers well

9 into the 1990s. The patented Timberland style was epitomized by rugged, chunky leather with a

10 thick lug sole.

11           47.     The Company designs, develops and markets footwear, comprising approximately

12 72% of sales, and apparel, comprising approximately 26% of sales, for men, women and children.

13 Timberland sells its products to retail accounts through its wholesale channel, through Timberland-

14 owned retail stores including factory outlets and Internet sales, and through a mix of independent

15 distributors, franchisees and licensees worldwide. The Company's primary reporting segments are

16 its North American, European and Asian markets. Its largest market is in the United States.

17           48.     In 1986, Jeffrey Swartz joined his father, whom he characterizes as more of "a

18 practical, hands-on, grease-on-your-hands and fire-in-your-eyes kind of guy" than himself. Jeffrey

19 Swartz led a reckless and rapid expansion under his father that almost ended in bankruptcy. As

20 Jeffrey Swartz told the *Financial Times* in 2010, "[w]e had an apocryphal meeting or two with the

21 bankers where it really hung in the balance." Nonetheless, in 1998, Sidney Swartz turned over the

22 reins to his son Jeffrey Swartz,

23           49.     By 2007, Timberland was in a state of turmoil, with its market share and stock price

24 badly damaged. As Jeffrey Swartz told the *Financial Times* in October 2010, "Our critics were plain,

25 saying 'you are doing a crappy job.'" According to the *Financial Times*, "[t]he crisis had an unlikely

26 source, as the company's yellow work boots fell out of favour with the world of hip-hop fashion

27 (although not before inspiring the naming of the artist and music producer Timbaland)."

28

50. Under the leadership of Jeffrey Swartz, Timberland had pursued the hip-hop sales boom but now had to confront what he characterized as "the reality of laziness in terms of strategy and sloppiness in terms of execution." *Financial Times*, October 2010.

**"Turn-Around" Efforts Commence**

51. In 2007, Jeffrey Swartz and his management team publicly promised to embark upon an effort to return Timberland to profitable growth. Supported by Michael Harrison, the Company's British-born president and a former executive of Proctor & Gamble who has a more conventional management style than the younger Jeffrey Swartz, the Company undertook a strategic review. It was, Jeffrey Swartz would tell the *Financial Times* in 2010, a process that involved sitting down as a team and "really beating the hell out of each other" before synthesizing an oft-repeated three-point strategy: (i) strengthen the "heat and height" of the Timberland *brand*; (ii) focus *geographically* on "one fortress city at a time"; and (iii) develop "a nimble and sustainable" *supply chain*. The restructuring included closing retail stores in North America with related layoffs at Stratham headquarters; reducing costs by licensing most of its branded clothing business; and focusing its marketing efforts on its strongest markets.

52. Nonetheless, when the global financial demise hit at the end of fiscal 2008, Timberland's stock was still hovering at approximately $10 per share.

**THE PRE-CLASS PERIOD DECLINE IN TIMBERLAND'S U.S. BOOT SALES**

53. Since 2008, the Company had reported in three product segments: footwear, apparel and licensing; and in three geographic segments: North America, Europe and Asia.

54. Consolidated revenue for 2008 decreased 5% from 2007, or $72 million, to $1,364.5 million. In 2008, the Company's North America revenue decreased 10.4% to $652.4 million. European revenues were flat (compared to 2007) at $553 million, but down 1.6% on a constant dollar basis. Asian revenues for 2008 were $159 million, compared to $155.5 million for 2007, but on a constant dollar basis, Asian revenues decreased by 5.5%. On a product basis, worldwide footwear revenue decreased 3% in 2008 compared to 2007, or $30.5 million, to $974.3 million. Worldwide apparel and accessories revenue fell 10.8% to $367.0 million, largely because the Company ceased sales of in-house Timberland brand apparel in North America through the

1  wholesale channel during the second quarter of 2008. Royalty and other revenue, which consists

2  primarily of royalties from third-party licensees and distributors, increased 15.8% over 2007 to $23.2

3  million in 2008, primarily as a result of the new apparel licensing arrangement in North America.

4       55.     Consolidated revenue for 2009 decreased 6% from 2008 to $1,286 million, a decrease

5  of $79 million. According to Defendants, that decline was driven primarily by decreased sales in

6  Timberland footwear in North America and apparel worldwide.  In 2009, North American revenue

7  declined 6.5% from 2008 to $610 million. European revenues decreased 4.3% to $528 million. Asian

8  revenues decreased 7.9% from 2008 to $148 million. Worldwide footwear revenue was down 4.4%

9  from 2008, or $43 million, to $931.2 million for 2009, according to Defendants, driven by declines

10  in men's and women's business in North America. Worldwide apparel and accessories revenue fell

11  10.3% to $329 million. Royalty and other revenue increased 10.5% in 2009 to $25.6 million,

12  reflecting increased sales of apparel in North America under the licensing agreement established in

13  2008.

14  **The Integrated Company Analysis**

15       56.     The *Wisconsin School of Business* published an Integrated Company Analysis of

16  Timberland's value as a going concern on December 14, 2010.  According to the Integrated

17  Company Analysis,

18      The global footwear market has shown slow growth over the past five years, ***but***

19  ***Timberland sales have steadily declined, primarily due to a weakening US market***. At the same time, Timberland has been challenged by increased operating costs, creating a need to focus on operational efficiencies including SG&A expense

20  reduction. The company has a strong opportunity to succeed in Asia and Europe

21  where revenues are increasing and penetration of Timberland and its brands is low.

22                                  \* \* \* \*

23      Timberland competes in a global footwear and apparel industry that has seen a

24  declining number of manufacturing companies ***due to hard-to-maintain profit***

25  ***margins***. There has been a recent shift in the market with more outsourcing of manufacturing and fewer players in the market. These industries, footwear in particular, are ***highly labor intensive*** and use relatively unskilled labor. Many

26  countries within the Asia-Pacific region provide low-cost manufacturing

27  environments suitable to meet the demands of western retailers for manufactured goods. Currently, more than 95 percent of all footwear sold in the US is imported.

28

1
2

*This shift in focus can be seen as many US footwear companies now "focus on value-added activities, like designing, marketing, and distributing shoes."*

3
4
5
6
7
8
9
10

57.     According to the Integrated Company Analysis in December 2010, "manufacturing risks ha[d] recently been a burden on Timberland. As discussed on the third quarter conference call in 2010, Timberland's inventory on hand ha[d] risen by 19% year over year. Although a portion of the increase in inventory [was] due to higher expected demand in the fourth quarter, much of the increase [was] due to *supplier inefficiencies and missed obligations in the supply chain resulting in Timberland holding inventory past expected delivery dates*."  In its Accounting Analysis, the Integrated Company Analysis specifically targeted Timberland's "inventory management" and the impact its SG&A was having on its profit margins:

11
12
13
14
15
16

*Supplier inefficiencies and supply chain issues can be seen in Timberland's inventory management metrics.* Its FY09 inventory turnover ratio is 4 times per year, which is on par with its competitors. However, Timberland's inventory turnover is down from 5.4 times in 2005. *Timberland is also carrying more inventory in its warehouse, with average days inventory outstanding increasing from 68.1 in 2005 to 90.4 in 2010* …. To help improve inventory management and supply and demand planning, Timberland has decided to implement SAP as its ERP system. Timberland hopes that the system will help management more accurately predict product demand and smooth costing through more effective inventory management.

17
18
19
20
21
22

*In addition to inventory management issues, Timberland is not operating as efficiently as its competitors*, which can be seen in financial comparisons. Timberland has the lowest EBITDA Margin and had the largest decline in EBITDA Margin over the 2005-2009 five year period (8.85% decrease) …. *One of the factors of a decline in EBITDA Margin is an increase in SG&A Expense. Timberland's competitors have been able to manage indirect overhead more effectively to counteract reduced sales. Timberland not only has the highest SG&A Margin, but also had a large increase in its SG&A Margin over a five-year period (6.95%)*…. Therefore, the company should focus on increasing operational efficiency and lowering indirect overhead.

23
24
25
26

*As a result of its high operating costs, Timberland's returns are low compared to competitors.* Timberland's Return on Equity as of 12/31/2009 was 9.7% compared to Wolverine World Wide (13.6%), Deckers Outdoors (26.7%), and to Columbia (6.9%). Comparatively, the footwear industry average ROE as of 11/26/2010 was 19.63%....

* * * *

27
28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

19

Timberland's financial position has been stable over the past 5 years, *but maintaining gross margins and reducing SG&A costs are important steps the company can take to improve financial performance*. *Timberland has recently experienced a decline in gross margin from record highs.* As of Q3 2010, the company has seen a rebound in gross margin, *but management cites increasing input costs as a negative pressure moving forward. Timberland must work hard to maintain gross margin levels in light of increasing labor and raw material costs.* In the area of raw materials, leather prices are rebounding from 20 year lows in 2009, but the price increases are currently demand focused and historical trends suggest that a dramatic long term increase is unlikely…. Although input costs are expected to rise, *gross margin maintenance and SG&A cost reductions are focal points for the coming years. This recognition is a positive sign and should be an additional boost to net income as revenue increases in the coming years.*

58.     Notably, for purposes of determining the value of Timberland's stock on a discounted future cash-flow basis, as commonly performed by analysts following Timberland's stock, the Integrated Company Analysis provided that Timberland's "DCF growth in perpetuity model yields *a target stock price of $27.64*…. This represents a 9.3% premium over Timberland's 11/22/2010 adjusted closing price of $25.27 and is in line with analyst estimates."   The three specific recommendations the Integrated Company Analysis provided to increase Timberland's enterprise value were:

- *"Improve Operational Efficiency"*
- *"Strengthen core brand position"* and
- *"Focus on considerate international market growth"*

59.     And as 2010 drew to a close, and Defendants set out to sell the Company at prices far exceeding its then prevailing stock price, Defendants engaged in a scheme to alter the perception of Timberland's enterprise value, by pulling forward its revenues, stuffing its wholesale channels, deferring the recognition of expenses and publishing misleading accounts of its changed growth trends.

### DEFENDANTS' EFFORTS TO CASH IN BY SELLING TIMBERLAND TO THE HIGHEST BIDDER

60.     By late 2010, Sidney Swartz and the Swartz family trusts owned 651,119 shares – less than 1% – of the Company's Class A common stock, but owned 10,841,296 shares – *more than 97%* – of the Company's Class B common stock that had superior voting rights to the Class A stock.

1   Jeffrey Swartz himself owned 822,158 shares of the Company's Class A common stock and 247,864

2   shares of the Class B common stock, *or the remaining 2.24% of the Class B stock that his father*

3   *and the Swartz family trusts did not then own*.  As a result, according to the Company's 2011 Proxy

4   Statement, "Sidney Swartz, his son Jeffrey and his grandchildren beneficially own all of the Class B

5   Common Stock" entitling them to "approximately 71.1% of the combined voting power of the

6   Company's capital stock," and "[b]y virtue of this stock ownership, Sidney Swartz is deemed to be a

7   'control person' of the Company within the meaning of the rules and regulations under the Securities

8   Act of 1933 [and] Jeffrey Swartz is one of the beneficiaries of the Family Trust."

9        61.      Jeffrey Swartz and Teffner were also all sitting on millions of dollars worth of

10  lucrative equity incentive compensation they had received in the form of stock options and warrants,

11  much of which had not yet vested, some of which was "underwater," and all of which would most

12  assuredly lose value if the Company's stock price declined.[3]  Indeed, in addition to the stock he

13  owned outright, according to the 2011 Proxy Statement, Jeffrey Swartz held options and warrants to

14  acquire nearly 1.5 million more shares at $9.34 to $31.29 per share:

15                          [CHART ON FOLLOWING PAGE]

16

17

18

19

20

21

22

23

24

25  _____

26  [3]      Stock options are "underwater" when their exercise prices are greater than the market price
27  for the underlying shares.  Notably, for example, with Timberland's stock closing just below $25 on
    December 31, 2010, 270,000 shares of Jeffrey Swartz's stock options were underwater.

28

**OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END**

| | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#)(1) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock that Have Not Vested (#)(2) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Swartz | 120,000 | | | 28.50 | 3/1/2011 | | | | |
| | 50,000 | | | 17.74 | 2/28/2012 | | | | |
| | 90,000 | | | 19.49 | 3/6/2013 | | | | |
| | 150,000 | | | 31.29 | 3/3/2014 | | | | |
| | 31,199 | 62,398(8) | | 9.34 | 3/5/2019 | | | | |
| | | 190,963(9) | | 9.34 | 3/5/2019 | | | | |
| | | | 170,200 | 19.45 | 3/4/2020 | | | | |
| | | | | | | 15,600 | 383,604 | | |
| | | | | | | | | 125,000(3) | 3,073,750 |
| | | | | | | | | 77,100(4) | 1,895,889 |
| Teffner | 9,166 | 18,334(5) | | 17.41 | 12/3/2019 | | | | |
| | | | 35,200 | 19.45 | 3/4/2020 | | | | |
| | | | | | | 6,667 | 163,942 | | |
| | | | | | | | | 11,600(4) | 285,244 |

62.    According to the 2011 Proxy Statement, if the Company was sold at $25.49 per share, all of the outstanding options and warrants would immediately vest and Jeffrey Swartz would receive ***$4,247,346***, and Teffner would receive ***$2,366,612*** for these options and warrants.

63.    Notably, Timberland ***has never*** paid a dividend on its stock and was prohibited from doing so under agreements with its lenders.  As such, as 2010 drew to a close, hundreds of millions of dollars of the Swartz family wealth, and that of Jeffrey Swartz, personally and of Teffner, were locked up in Timberland stock and other than their receipt of salaries, bonuses, retirement contributions and stock options, these Defendants simply had no access to much of their wealth. Based on the market's sentiment toward Timberland, including as described in the Integrated Company Analysis, the Defendants were also acutely aware of the market's insistence that they improve the appearance of its financial performance and prospects, and the need to report strong earnings growth trends for the Company to change the valuations of its stock.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

64.     Meanwhile, VF, which describes itself as a purveyor of "branded lifestyle apparel including jeanswear, outdoor products, image apparel, sportswear and contemporary apparel brands," had been pushing the Swartzes to sell it Timberland for more than a decade.  Other fashion brands VF then owned included Vanity Fair, Lee, Wrangler, The North Face, Nautica, and JanSport.  VF considered Timberland a good fit for its business model and, as emphasized in the Integrated Company Analysis, the shoe sales business that was Timberland's bread and butter was becoming more and more commoditized and it would become more and more difficult for Timberland to distinguish itself from its cheaper competitors, and to employ its brand to command higher prices.

65.     According to the "Background to the Merger" section of the Notice of Action by Written Consent and Appraisal Rights and Information Statement ("Merger Information Statement") that Timberland would later file with the SEC on August 24, 2011 (and distribute to shareholders[4]), Jeffrey Swartz and VF's CEO began seriously discussing a sale of Timberland to VF in December 2010, and by December 15, 2010, VF was telling Defendants that based on the then publicly available financial data, VF was only willing to pay a cash price for all of Timberland's Class A and Class B common stock in the low $30's per share.  The Company's Series A common stock price closed just below $25 on December 15, 2010, meaning the proposed "control" premium being offered was approximately 20%.[5]

66.     Both to increase Timberland's market price and to induce a higher offering price from VF, on January 14, 2010 Defendants provided VF with certain non-public information regarding Timberland's then-present financial results for the fiscal year ended December 31, 2010.  Following

---

[4]     Notably, because the Swartz family owned a controlling interest in Timberland, the face page of the Information Statement clearly provided: "We Are Not Asking You For A Proxy And You Are Requested Not To Send Us A Proxy."

[5]     *InvestorWords.com* defines "control premium" as "[t]he amount an investor will pay to acquire control of a company, typically an amount higher than the current market value of the company. An investor seeking to acquire control of a company is highly motivated, and is typically willing to pay more; this often comes into play when one company is trying to acquire another, and is trying to convince the second company to agree to the deal. The amount above the market price that the investor offers for the shares is known as the "control premium."   Go to <http://www.investorwords.com/7588/control_premium.html>.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

VF's review of this non-public material and, based on its own evaluation of its content, on January 28, 2011 VF increased its offer to the high $30's per share, and possibly as much as $40.00.  Based on the closing price of Timberland on January 28, 2010 of just below $27 per share, VF's new offer (of $40 per share) indicated a 37.5% premium above market for Timberland's stock, a control premium required to buy control of Timberland.  VF again confirmed its willingness to pay $40 per share on February 7, 2011, conditioned upon its "due diligence" review of Timberland's books and records to verify what Timberland's management had represented to VF and its bankers.[6]  To encourage VF to increase its price, Defendants "managed" Timberland's earnings -- by pulling forward sales revenue that would otherwise be reported in later periods, and deferring expenses whose timing Defendants controlled, and then touting the vastly improved financial performance and earnings trends as demonstrating vastly improved product demand and the Company's success in changing its cost structure.  This is the type of information investment bankers and analysts commonly use in developing discounted future cash flow analyses to determine an enterprise's value and stock price.

67.    Thus, on February 17, 2011, Timberland released its fiscal 2010 and 4Q 2010 earnings results, and held its earnings conference touting Timberland's surprising transformation, causing *the Company's stock price to surge 30% in a single trading session, closing at $35.93 per share that day*.  And, as Timberland's Merger Information Statement disclosed, the following sequence of events occurred in the negotiations with VF:

- Later on February 17, 2011, Swartz met with Timberland's Board to "update" it on VF's due diligence, explaining that on February 28, 2011 it would be delivering its updated view of Timberland's valuation.  According to this Statement, Timberland had not provided VF with its initial projections for fiscal years 2011-2015, however instead provided only the Net Income and EPS for the "Updated" 2011 forecast;

---

[6]    The *Merriam Webster* dictionary defines "due diligence" as the "research and analysis of a company or organization done in preparation for a business transaction (as a corporate merger or purchase of securities)."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

24

- On February 18, 2011, Goldman Sachs was contacted to act as Timberland's Financial Advisor.  Goldman Sachs received both the original and "updated" 2011 forecasts for its fairness opinion;

- On February 24, 2011, Jeffrey Swartz and Teffner met with VF representatives for further diligence discussions, including with respect to Timberland's finances and supply chain; and

- On March 4, 2011, Jeffrey Swartz suggested to VF that it increase its price to $43, which VF did.

68.     Knowing a larger control premium would now be required both from the Swartzes and the Timberland Board of Directors, VF unilaterally increased its offer to $41 per share in early March, 2011.  On March 3rd, Jeffrey Swartz told the Timberland Board he still felt VF would be willing to pay more than $41 per share. *At the same Board meeting, Sidney Swartz openly questioned Timberland's ability to attain its long-term operational plans in light of the prior years' results, uncertainty about the succession of key business leaders at the Company and rising costs putting pressure on Timberland's margins.*  Nonetheless, the Board expressly directed Jeffrey Swartz to seek yet a higher offer from VF for Timberland.

69.     Later in the day on the 3rd of March, VF increased its offer, now offering to pay up to $42 cash per share.  Once again Jeffrey Swartz rejected the offer.  VF then increased its offer to $42.50 per share on March 4, 2011.  The Company's stock price, which was still drifting upward based on Defendants' bullish February 17, 2011 statements, closed above $39 per share that day.  As such, Jeffrey Swartz countered at $43 per share, *which VF accepted that day*.  On March 29, 2011, VF's counsel, Davis Polk, delivered draft deal documents which contained a condition to closing that no more than 10% of Timberland's stockholders would elect to exercise their appraisal rights under Delaware law.

70.     Defendants' extremely bullish statements to the market on February 17th, and in later conferences, however, continued driving Timberland's stock price up in March and April, so that it was becoming increasingly unlikely that Timberland would be able to satisfy the 10% condition.  VF, having by this time reviewed Timberland's true financial performance, was unwilling to

1    increase its offer.  So, on April 4th, Defendants rejected VF's offer, and formally terminated

2    negotiations with VF, until after Timberland's stock price would be driven back down.

3        71.    When Timberland released its 1Q 2011 financial results on May 5, 2011, and the truth

4    about its true financial condition and earnings trends became revealed, the Company's stock price

5    plummeted. Timberland's stock price declined $11 in a single trading session, or 27%, closing at

6    $30.65 per share.  Based on this decline, the VF offer of $43 would constitute a control premium of

7    almost 29%, thereby reducing the likelihood that the Company's public shareholders would exercise

8    their appraisal rights or otherwise successfully challenge the sale to VF.

9        72.    On May 12, 2011, one week after the 1Q 2011 earnings announcement, VF called to

10   resume discussions and reopen the sales negotiations at the same $41-$43 per share price. Jeffrey

11   Swartz, however, refused to formally reopen the discussions until after Timberland's Annual

12   Shareholder meeting scheduled for May 26th.  On June 12, 2011, the Timberland Board agreed to

13   the long outstanding $43 per share offer.  On August 24, 2011 the Merger Information Statement

14   was published, and on September 13, 2011 the acquisition was completed.  On September 22, 2011,

15   the Company notified the SEC it would cease its reporting under §12(g) of the Exchange Act.

16       73.    In addition to the approximately ***$495 million*** Sidney Swartz received for the Swartz

17   family stock in the sale of Timberland to VF, Defendants Jeffrey Swartz and Teffner each received

18   more than ***$26.8 million*** and ***$2.3 million,*** respectively, for their Timberland stock, stock options and

19   warrants in the sale.[7]  Although the Individual Defendants' manipulations and false and misleading

20   statements and omissions had succeeded in netting a huge payout for the Swartz family and Teffner,

21   public shareholders who remained ignorant of this scheme did not fare as well.  Public investors who

22   purchased their stock during the Class Period at inflated prices, and particularly those who sold

23   before the deal with VF was disclosed, and the stock price recovered somewhat with VF's agreement

24   to pay a control premium, suffered high losses exceeding $60 million as a result of the fraud.

25

26   _____

[7]    Including additional cash severance, perks and tax reimbursement they were promised,
27   Jeffrey Swartz and Teffner received, respectively, more than $37.2 million and $4.88 million each in
     the sale of Timberland to VF.

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## DEFENDANTS' EARNINGS MANAGEMENT AND
## CONFIDENTIAL WITNESS STATEMENTS

74.     As Timberland described in its 2010 Form 10-K, for its wholesale customers, Timberland generally recognized sales revenues in the time period in which it shipped goods to the wholesaler, referred to as "sell in," rather than when the wholesaler sold the Timberland goods to its consumers, or at the time of "sell through."  As various confidential witnesses ("CW's") described, however, the wholesalers kept current records of their sales of Timberland products to consumers, and provided this "sell through" data to Timberland, known as "comps," on a weekly or other current basis.  Thus, by February 17, 2011, Defendants would have known that product it had delivered in 4Q 2010 to wholesalers had not been sold to consumers, freeing up wholesalers' shelves for new Timberland sales.

75.     When Timberland delivered product to wholesalers which was not yet needed, Timberland's wholesale channel became "stuffed," reducing future wholesale orders (or "backlog"), and necessarily reducing shipments and sales revenue in later quarters.

76.     As Jeffrey Swartz described in the February 17, 2011 earnings conference, Timberland's business was "seasonal," *e.g.*, that consumer sales increased in the fourth quarter of the year during the Christmas season.  To prepare for the Christmas season, and for sales of summer shoes, typically "sell-ins" to wholesalers were strongest in the first and third quarters of the year. According to Timberland's 2010 Form 10-K, the 2010 North America revenues (which for years had been stagnant) increased 6.1% to $647.3 million, "driven by the wholesale business, which reflects . . . strong sell-in of Fall 2010 product."

77.     And, at the 1Q 2011 earnings call Jeffrey Swartz admitted that the Company had had problems in "sell through" for its North American classic boot business.  The 26.2% growth in accounts receivable as of December 31, 2010 (versus December 31, 2009), was also odd because it was attributed to "the 26.7% increase in revenue in the fourth quarter, combined with timing of shipments in the quarter," meaning that, in 2010, large "sell-ins" of Timberland products were occurring in the fourth quarter, despite Timberland's usual seasonal patterns.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

78.     When disproportionately high shipments, or "sell-ins," are made, inventory balances should drop and yet Timberland reported a substantial 149% increase over December 31, 2009 in the inventory account on its balance sheet as of December 31, 2010.  Teffner explained this away on the February 17, 2011 earnings call as necessary to service the 19% growth in wholesaler order "backlogs," but the revelations made on May 5, 2011 in connection with the Company's 1Q 2011 results, suggest that the Company had simply deferred expensing product costs that should have been recognized in 2010.  Thus, *e.g.*, the 1Q 2011 Form 10-Q reported $30 million in "unallocated expense" attributed to, *inter alia*, "inventory cost variances and adjustments to standard costs."  And, while Teffner had attributed the growth in the December 31, 2010 inventory balance to expected higher sales in early 2011, by March 30, 2011 the Company's inventory balance had increased by a stunning ***36.5%***, versus the balance as of the comparable point in time in 2009 -- also suggesting that, in fact, wholesale deliveries had been pulled forward in 2010, so that there was a mismatch between sales and inventory on hand in 1Q 2011.

79.     In explaining away the inventory discrepancies at the 1Q 2011 earnings call, Teffner asserted, for the first time, that Timberland had "deliberately chosen" to increase its inventory balances to protect the increased sales demand it foresaw.  Other costs unexpectedly increased in Timberland's 1Q 2011 reported results, particularly for much higher advertising costs, were also explained by Teffner as having been "deliberately chosen" for increase in 1Q 2011, "to take advantage of the strong sell-in from year end" -- *i.e.*, to assist wholesalers who had been unable to move unneeded Timberland products off their shelves.

80.     That the Defendants had knowingly misled investors about the demand for Timberland products and its true structural costs and earnings trends when they discussed the Company's 2010 results and prospects in February 2011, was further confirmed by a series of CW's.

81.     CW1 is a former Timberland Sales Planning Analyst who worked in inventory planning from early 2006 through late 2008, and then moved into sales as an account executive in late 2008 until February 2011.  CW1 was one of about 40 salesmen Company-wide.

82.     For 4Q 2010, CW1 recalled a push by Timberland to reach what he understood to be a Company-wide goal of $100 million in sales. The Company offered account executives such as

him incentives to hit 120% of their goals, dangling out a free trip as a reward. He noted that a big sales push at the end of quarters was fairly typical at Timberland, as was some sort of incentive to make sales goals. However, the Company had never offered a free trip before.  Based on emails he received from his superiors in 4Q 2010, CW1 said the sales numbers indicated that the Company was on track to meet its goals. He noted that he won a contest that quarter in which he was given a free trip. "From my standpoint, everything was going well."  Asked whether the Company did anything special to try to achieve its goals in 4Q 2010, CW1 said that ***Timberland "pulled forward" some deals from the next quarter and shipped product in the last quarter of the year that had originally been scheduled to be shipped during the next quarter.***

83.    In explaining the process of pulling forward deals, CW1 said it began when he received emails from his boss, Rowley, with a list of his pending orders in a spreadsheet. Rowley asked him to call all of his accounts with orders pending in the next quarter, 1Q 2011, and ask them whether they would take shipment early for their pending orders.  CW1 said he saw an email strand below Rowley's email to him, which included emails from Michelle Wachowiak, the operations manager at Timberland who worked with sales planning and booked revenues, returns, and deductions. In the emails, Wachowiak ordered Rowley to contact his account executives to ask them to pull forward deals scheduled in the future into 4Q 2010.

84.    CW1 said that when he contacted his customers in 4Q 2010 about shipping orders to them early, with the original prices, discounts and other terms, most of them cooperated with Timberland's request.  The witness noted that the customers didn't have to pay for the product any earlier than they were originally set to do so.  He said that Timberland always asked him to get written permission from customers to ship the products early.

85.    CW1 said that Timberland "pulled forward" deals "every quarter," though when asked whether there was unusually strong pressure to hit his fourth quarter goals, CW1 stated that "they were definitely pushing to hit $100 million in the fourth quarter and finish the year strong."

86.    CW1 said Timberland offered customers special deals and discounts on its products in order to incentivize them to make purchases during 4Q 2010.  The Company discounted some of its products and also offered its customers "swaps."  Swaps meant that Timberland would take back

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   footwear that was failing to sell on retailers' shelves, and in return, Timberland would send

2   customers more popular footwear that it wanted to move out of inventory. "We would swap out

3   slower movers for better selling products," said CW1.  He called the slower moving products "dogs"

4   that Timberland took back to keep some customers happy.

5          87.    CW1 said that his customers typically had 30 to 60 days to pay invoices for "pre-

6   season sales" and that each customer received different levels of discounts varying from 5% to 15%.

7   The discounts varied according to what type of customer and what kind of product they were buying.

8   When CW1 made a deal, the customer signed a purchase order and sent it back to him. He said he

9   entered the paperwork into the Company's computers and then sent the paperwork on to the finance

10  and accounting department.

11         88.    CW2 worked as a Senior Financial Analyst at Timberland from the summer of 2009

12  until the fall of 2011.  He was responsible for financial analyses of the Company's gross margins on

13  all of its product lines. He also produced forecasts and budgets for the Company's product

14  development group.

15         89.    CW2 explained that he and his general accounting manager sent the financial

16  analyses they produced of the gross profit margins to the vice presidents of the Product Development

17  group and to the executive team that ran Timberland. The analyses provided the managers with an

18  overview of the profit margins of each of the hundreds of shoe lines produced by Timberland.

19         90.    CW2 also provided the management team with forecasts of demand of the

20  Company's product line based on the numbers of orders from retail and wholesale customers. CW2

21  analyzed the cost of producing the Company's product lines and estimated the gross profit margin

22  for each one of the shoe and boot products. "I gave them the financial picture," he said.

23         91.    In February 2011, CW2 stated that he saw the orders coming in for the upcoming

24  season – the spring and fall of 2011. "I knew what was going on in February, March, April and

25  beyond in terms of orders and profit margins," CW2 said. He examined the numbers in an Excel

26  spreadsheet on a weekly, monthly and quarterly basis.

27         92.    From mid-2007 to late 2011, CW3 worked as a Financial Analyst and Senior

28  Financial Analyst for the corporate accounting group that rolled up all of Timberland's numbers on a

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1 worldwide basis for the board of directors and executive management team.  CW3 was one of the

2 financial analysts who reported to Jon Waterhouse, the manager of Financial Planning and Analysis

3 at Timberland.  Waterhouse reported to John Fitzgerald, then current Vice President, Corporate

4 Controller and Chief Accounting Officer at Timberland.

5       93.    Every month and at the end of every quarter, CW3 helped prepare financial analyses,

6 budgets and forecast reports in Excel spreadsheets based upon all of the revenues and expenses of

7 Timberland's units globally.  CW3 prepared profit and loss reports by rolling up the revenues, costs

8 and expenses.  CW3 consolidated the numbers and "made them look pretty" for CFO Teffner, CEO

9 Swartz and members of the board of directors to review.  In the consolidated reports, CW3 gave the

10 executive team and the board "the high points," including total revenue for the Company, operating

11 income and total expenses. Power Point presentations were prepared by CW3 that the CFO would

12 give the board at the end of quarters. At times, the CFO or others would request special ad hoc

13 reports that CW3 also helped prepare.

14       94.    The Company maintained a master database by region and business unit that broke

15 down expenses, income and compared "actuals" vs "projections and forecasts" for each unit and

16 each region, CW3 said. The board and executives could check the numbers on a monthly basis.

17       95.    Once CW3 finished preparing the consolidated reports, they were emailed to

18 Waterhouse who then forwarded them to the executive team and board. In his absence, the witness

19 emailed the reports directly to the executive team and board. Their office rolled up the numbers for

20 all of the units globally so management had an overview of the Company's performance.

21       96.    CW3 also did analyses of orders and could see the Company's backlog in the

22 Company's Master Order System, which was maintained in Cognos. This is where orders were

23 entered. According to CW3, the Master Order System did show when the Company pulled orders

24 forward if customers were ready to receive shipment in an earlier quarter than a later one. This

25 occurred every quarter, including 4Q 2010.

26       97.    The monthly and quarterly financial reports CW3 helped prepare for the executive

27 team and board tracked costs and profit margins. The reports showed costs rising steadily and

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    growing throughout the period from the fourth quarter of 2010, or perhaps even earlier, through May

2    2011.  "Everyone was aware of it," the witness said. "It wasn't a shocker."

3        98.    CW4 was employed as a Finance Manager at Timberland from 2002 to late 2010.

4    Among other things, CW4 managed the financial aspects of Timberland's wholesale business in

5    Canada.

6        99.    CW4 explained that information pertaining to the current status of Timberland's sales

7    was readily available to the Company. According to CW4, sales directors at Timberland were in

8    constant contact with representatives that worked for Timberland retailers. The retailers provided

9    Timberland's sales directors with up-to-date information about current sales.

10       100.    According to CW4, when a retailer provided a Timberland representative with

11   information about current sales, it was known as a "comp."  CW4 explained that a "comp" took

12   place when a representative at a Timberland retailer, such as Footlocker, provided Timberland with

13   detailed information pertaining to sales of Timberland products. CW4 provided an example, saying

14   that the retailer may tell the Timberland representative that 75% of a certain product was sold within

15   two days of being placed on shelves. The witness said "comps" occurred very frequently and

16   provided real-time information about sales from "month to month" and "quarter to quarter."

17       101.    CW4 said information provided by retailers was used to determine Timberland's sales

18   forecasts. Sales forecasts for Timberland products were created, discussed and analyzed during

19   weekly forecast meetings that were attended by the head of CW4's division, Jennifer McLaren and

20   others. During these meetings, sales of Timberland products at "the big players" were discussed. An

21   example of a big player was Footlocker.

22       102.    With respect to inventory, CW4 said Timberland in general was conservative when

23   building up inventory. "They would buy less rather than more," the witness said. "From what I

24   remember, they wanted to keep inventory at a minimum." CW4 explained that there was a long lead

25   time between when products were ordered and when the manufacturing process was finished.

26   According to CW4, with respect to inventory, the Company would have wanted to build up

27   inventory for the holiday season.

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

103.   CW4 explained that if Timberland's sales projections were incorrect and its products weren't selling at retailers, the retailers would inform Timberland that the products would need to be sold at discount prices. If there was still excess inventory, Timberland would then look to sell product to outlets such as TJ Max and Marshalls.

104.   In terms of internal systems, CW4 said during most of her tenure at Timberland the Company used a system called Hyperion Retrieve to house financial information. However, approximately two years ago, the Company switched to an SAP system. Asked about Jeffrey Swartz's involvement in daily operations, CW4 said he was very involved. He attended meetings with all departments and frequently spent time with employees in all sectors of the business, from design and development to finance. He knew most employees by their first names.

105.   CW5 worked at Famous Footwear from 2002 until the summer of 2011.  For the last two years of his tenure, he worked as a Buyer at Famous Footwear's corporate office in St. Louis, MO.  As a Buyer, CW5 was responsible for purchasing specific apparel lines from various vendors. As he put it, "we [*i.e.*, Buyers] preview products, assemble assortment by brand, and write out purchase orders on a monthly basis."  Among other vendors/lines, CW5 purchased Timberland "Casuals" and "Boat Shoes" (which he noted are not items associated with the winter season).

106.   As the witness explained, "Famous Footwear provided its vendors access to its weekly sales.  Specifically, Famous Footwear provided so-called "Comps" to Timberland (and other vendors) on a weekly basis.  These comps (which stands for "comparison") were spreadsheets containing the following data with respect to the vendor in question:  styles, units in stock, total sales for the past three weeks (broken down per week), average "out-the-door" revenues (which took into account employee discounts, promotions, and other reduced-price sales), in-stock inventory, and year-to-date sales figures (comparing the present sales with sales transacted exactly one year prior). Comps were sent by the Famous Footwear IT department to vendors including Timberland, and Buyers like CW5 also received hard copy versions of these reports on a weekly basis.

107.   In addition to having access to "comps," certain vendors were able to access more granular data through the use of a third-party IT system known as Edifice.  CW5 said that retailers like Famous Footwear used Edifice to provide detailed information (including the type of metrics

listed above) to vendors.  Vendors were required to subscribe to the service for a fee.  Additional information on Edifice can be found at http://www.edificeinfo.com/services/retailer-services.aspx.

108.   CW6 worked as a Senior Account Executive at Timberland from 1997 until June 2011. He reported to the Regional Director of Sales of Timberland Pro, the division of the Company that sold footwear for construction workers and other professionals.  CW6 was responsible for selling Timberland Pro products to retail accounts in New England, including stores such as the Kittery Trading Post in York, Maine.

109.   CW6 said Timberland "always had excess inventory at the end of quarters" and the Company offered discounts to retailers to take the product. CW6 stated that there were no agreements made with retailers when sales were originally made guaranteeing that products could be returned to Timberland, but stated that accommodations were made for the retailers.  As CW6 explained, "if something didn't sell, we'd work out some kind of agreement to take it back."

110.   CW7 was employed as an Account Executive at Timberland from early 2007 through late 2008.  His accounts included independent retail stores throughout the Philadelphia area, such as Sneakerville, Kicks USA and the Downtown Locker Room.

111.   CW7 explained that his retail accounts could place orders for Timberland merchandise in several different ways.  Often, the witness would take orders directly from the retailers.  In these cases, he would then relay the order to the Timberland customer service representative.  Other times, retailers would fax their orders to Timberland, and an account manager or customer service representative would input the order into its ordering "system."  CW7 noted that faxes were typically sent by "older accounts."  Toward the end of his tenure, Timberland launched a site in which accounts could place direct orders online.

112.   Regardless of the method used to place orders, CW7 said that orders were inputted into what he referred to as Timberland's "system" generally on the same day an order was placed. The witness explained that Timberland had a software system it had developed that allowed its employees to log in and view orders and sales numbers.  He said that sales were typically viewable in the system the day after a retail account placed an order.  CW7 said that Timberland kept very up-

1   to-date records of orders and sales that were available for view through this system, which he could

2   log into via an online portal.

3        113.   CW7 said that although he worked with independent retailers that did not report sales

4   to Timberland regularly, he was aware that larger retailers, such as Foot Locker, kept Timberland

5   up-to-date on sales on a weekly basis.  He said the retailers would provide Timberland with "sell-

6   through" information that detailed weekly sales of its different lines.

7        114.   Asked about what happened if a Timberland product or line produced unsatisfactory

8   sales figures for a retailer, CW7 said it depended on the size of the retailer.  In the case of his

9   independent accounts, Timberland's initial sales were typically final.  However, he was aware that

10   the process was different for larger retailers, such as Macy's.  If a line wasn't producing positive

11   results at a large retailer, Timberland would work with that retailer.  For example, Timberland would

12   take back a line that wasn't doing well, with the agreement that the retailer take on a different line.

13   In other cases, Timberland would take back merchandise that wasn't selling at large retailers with

14   the agreement that the retailer would take on additional lines the following season.

15   **DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND SCHEME TO DEFRAUD DURING THE CLASS PERIOD**

16   **False and Misleading February 17, 2011 Statements and Omissions**

17        115.   On February 17, 2011, Timberland announced its 4Q 2010 and annual financial

18   results for the fiscal year ended December 31, 2010.  While 4Q 2010 sales purportedly increased

19   26.7% to $491.1 million, beating analysts' sales expectations of $409.7 million, 4Q 2010 ***earnings***

20   ***doubled*** versus the prior year to $42.1 million.  While 2010 full-year sales increased 11.2% over

21   2009 sales, to $1,429.5 million, full-year diluted ***earnings per share increased by 89%*** to $0.82 per

22   share, or $96.6 million, dwarfing analysts' earnings expectations of $0.50 per share.

23        116.   Assuring the market that this performance was representative of a trend in increased

24   demand and structural changes in the Company's cost structure (such as that which the Integrated

25   Company Analysis had suggested was needed in December 2010), the Company's release quoted

26   Jeffrey Swartz as stating that ***the Company's 4Q 2010 "results [were] the culmination of***

27   ***disciplined focus on our operating model*** and targeted investments in our brand," adding that ***"[a]s***

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   *our progress in the North America business demonstrates, we have the right strategy and the right*

2   *team in place to grow Timberland to be the number one outdoor brand on Earth."*   And

3   Defendants concealed that, in fact, the extraordinary performance was an aberrational event, created

4   by stuffing the wholesale channel with goods that remained unsold to consumers, and deferring

5   expenses for product costs by building up inventory and delaying advertising expenditures to pump

6   up the Company's stock and thereby support the as yet undisclosed sales negotiations with VF.

7        117.    Jeffrey Swartz and Teffner attended and spoke on the February 17, 2011 earnings call

8   with analysts.  During that call, Swartz again emphasized the "real progress Timberland ha[d] made

9   over the last year," stating that "[w]ith four successive quarters of brand right growth, *2010 marks*

10  *the moment when Timberland's shifted from playing defense to playing offense."*

11        118.    Discussing purportedly then-current *"trends and strategy in [Timberland's]*

12  *regions,"* Swartz emphasized on February 17, 2011, long after the Defendants would have received

13  the "comps" for the disappointing "sell-through" of Timberland products during the Christmas

14  season, that would depress future orders and sales, that he was "very pleased, very pleased to report

15  *positive momentum* from the Timberland branded business in North America, with revenue up for

16  2010 and up double digits in the fourth quarter," noting "North America was *returning to profitable*

17  *growth*."  Teffner confirmed Jeffrey Swartz's account of Timberland's then-current trends, stating

18  the Company and its executives were "pleased to be able to report *real strength and momentum in*

19  *[its] business*."  Emphasizing the tremendous sales and profits growth during 4Q 2010, Teffner

20  stated Timberland and its executives "fe[lt] strongly that these results show[ed] that *[they] [could]*

21  *deliver profitable growth* as [they] buil[t] [their] business to be the number one outdoor brand on

22  earth."

23        119.    Concerning purportedly then-current inventory levels, Teffner acknowledged that

24  total inventory had increased 14% year-over-year, but emphasized that the Company's "*level of*

25  *excess inventory" had actually "declined as a percentage of inventory compared to the fourth*

26  *quarter of 2009."*  Later in the call, in response to an analyst's question regarding how Timberland

27  and its executives felt about its "inventory position right now," Teffner again confirmed they felt

28  "pretty confident with the inventory position right now."

120.     Concerning how Timberland's sales trends were shaping up in the first half of 2011, Swartz stated "when you look at our backlog coming into this year, Carrie talked about inventory up 14%.  That's good in the context of a ***backlog that's up 19%, double-digit increases in every one of the regions***." Characterizing this metric as an "indication that's obviously, principally an H1 reality, because we're just beginning the fall selling," Swartz emphasized that "***indications are that as we performed at retail, we have the right – it's ours to lose.  It's ours to capitalize on the momentum that we've created with retailers.***"

121.     ***Responding to an analyst's request that Swartz confirm previous predictions that through "expense management and trying to improve the brand," he "expect[ed] fully to return to 15% operating profit growth,***" ***Swartz emphatically confirmed that "15% operating income is exactly the kind of result that we're accountable for,"*** emphasizing that Timberland and its executives were then ***"making progress in that direction"*** and that Swartz was ***"not going to back away from the goal."***

122.     Defendants' February 17, 2011 statements were false, misleading and/or misleadingly incomplete because:

(a)     Defendants then knew demand for the Company's products had dramatically declined in key markets, including in North America for its key yellow boot product;

(b)     Defendants then knew the purportedly extraordinary sales growth that they had attributed to sales "momentum" experienced in 4Q 2010, had instead been generated by stuffing the channel;

(c)     Defendants then knew that the extraordinary earnings growth, rather than being representative and indicative of changed trends, had been accomplished by "deliberately" deferring inventory and advertising expense into 2011 quarters;

(d)     Defendants then knew they were significantly building up unneeded and improperly priced inventory so that, the "level of excess inventory" had, in fact, increased over that of 2009; and

(e)     Defendants then knew, for all these reasons, that there was no legitimate basis for their assurances that the Company was "making progress in [the] direction" of a 15% operating

1    margin growth, and that instead the fourth quarter results and falsely described growth "trends" were

2    an aberration they created to pump up the Company's stock price in support of the sales negotiations

3    with VF.

4         123.    Thus, based on the Company's extraordinary financial performance in 4Q 2010,

5    *coupled with Defendants' bullish statements about the purportedly then-present sales trends, cost*

6    *discipline and inventory levels and an anticipated return to a 15% operating profit*, the Company's

7    stock price surged 30% in a single trading session on February 17, 2011, closing at $35.93 per share,

8    a 52-week high, with more than four million shares changing hands that day.  These same results and

9    trends were then used by Defendants and Goldman Sachs to prepare and provide to VF "revised"

10   2011 forecasts and discounted future cash flow rationales in support of the VF negotiations.

11        124.    As emphasized by the *Associated Press*, the uptick in Timberland's stock price was

12   attributable to the investment community's belief that in 4Q 2010, Timberland's "demand increased

13   worldwide, particularly for the company's shoes."

14        125.    Reiterating Defendants' bullish mantra, Susquehanna analyst Christopher Svezia

15   characterized Timberland's ongoing "revenue momentum [as] strong," stating "[l]onger-term," *"the*

16   *brand continues to recover from a sales drop during the recession,"* and that *"[t]he company*

17   *appears to be firing on all cylinders moving into 2011 with virtually all categories, regions and*

18   *channels expected to show growth next year."*  Svezia kept his "Positive" rating on the stock and

19   increased his price target by $9 to $41.

20        126.    *The Wall Street Journal* too noted that "Timberland Co.'s fourth-quarter profit

21   jumped 89% as revenue surged *amid robust growth in global same-store sales*," reporting that

22   "[t]he footwear company, which specializes in boots and outdoor apparel, *saw broad growth*."

23        127.    Wasting no time in case the negotiations with VF faltered, Jeffrey Swartz

24   immediately cashed in on the price inflation his bullish statements and forward guidance had caused,

25   selling more than $6 million of Timberland stock into the public market that very day.  These sales

26   were unusual both in timing and amount as Jeffrey Swartz had not publicly sold Timberland shares

27   in years, as his family's controlling stock ownership of Timberland provided it with substantial

28   control over the Company's operations.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

128.    Based on Defendants' bullish February 17th statements, on February 18, 2011, *Bloomberg* reported that Citigroup too had raised its price target for Timberland to $38 per share from $27 per share, emphasizing that "EPS estimates were revised upwards to $2.50 from $1.75 vs. consensus estimates of $1.74 for 2011, and to $2.90 from $2.00 vs. consensus estimates of $2.45 for 2012."

129.    Additionally, on February 18, 2011, Longbow Research's Jonathan Grassi issued a report increasing his valuation of Timberland's stock to $38.36 per share, emphasizing, based on Defendants' positive comments, that: ***"We believe that TBL's strategic execution in rejuvenating the brand is beginning to pay dividends."*** Concerning Timberland's growth prospects based on Defendants' February 17, 2011 statements, Grassi emphasized:

> FY11 Outlook. ***TBL top-line looks very well-positioned relative to previous years following a strong finish to 2010 and an optimistic outlook for FY11's revenue growth potential given a backlog order book that is up 19% (orders for 1H11) with clear momentum in Earthkeepers and demand for the classic boot internationally.*** We expect gross margins will continue to be pressured in 1H11 as TBL has implemented limited price increases and is faced with higher leather, labor and transportation cost. Product cost inflation is expected to escalate heading into 2H11, ***but price increases are expected to offset a significant portion of the higher cost***.
>
> ***Adjusting FY11 Estimates.*** We are ***increasing our FY11 EPS from $1.67 to $2.26 as we have become more aggressive with our top-line growth expectations for the company following improved demand for the classic boot business internationally and growing demand for Earthkeepers.*** Our 12% top-line growth expectations for TBL in FY11 is partially offset by gross margin compression of 190bp from product cost inflation.

130.    Conversely, when Timberland competitor Nike issued its own quarterly earnings report on March 18, 2011, according to *Bloomberg*, "the world's largest sporting goods company sank 9.2 percent, ***the most in more than two years,*** after profit missed analysts' estimates for the first time in 19 straight quarters, amid higher costs." According to *Bloomberg*, like Timberland, "Nike [was] grappling with higher costs for cotton, labor and transportation" and "[i]ncreasing some prices and reducing marketing costs couldn't stop gross margin [from] narrowing 1.1 percent percentage points in the quarter."

**False and Misleading February 26, 2011 Statements and Omissions**

131.    On February 26, 2011, Timberland issued its fiscal 2010 Annual Financial Report to Shareholders on Form 10-K.  In addition to including the Company's annual 2010 financial results, the 2010 Annual Report contained a letter to shareholders and would-be investors signed by Jeffrey Swartz which emphasized in relevant part:

> ***2010 marked an important turning point for Timberland.***  With brand-right top line growth, strong earnings increases, and a rock-solid balance sheet, ***2010 was the culmination of disciplined focus on our business and targeted investments in our brand. We grew revenue across North America, Europe, and Asia.*** We grew Classics, Earthkeepers®, and Outdoor Adventure. We grew men's, women's, and kids'. We grew our retail footprint and our comparable store sales. We grew footwear, apparel, and accessories. ***As our progress shows, we have the right strategy and the right team in place to grow Timberland into the number one outdoor brand on Earth.***
>
> At the heart of our performance is a unique Timberland® brand story of authenticity, sustainability, and deep roots in the New England outdoors.  Authenticity runs throughout our products, but is especially evident in our Classics category, the foundation of our brand and our business. ***In 2010, our global Classics business returned to growth, and helped to provide a stable foundation for our key growth initiatives.***
>
> 2010 was a breakthrough year for the product line at the center of our growth strategy: Earthkeepers®. With annual sales increases in the triple digits in every region and across all genders, Earthkeepers® not only grew our business, but also served as a platform for breaking through with women, a huge growth opportunity for Timberland. Nowhere is our brand's commitment to sustainability more clear than with Earthkeepers®, a unique combination of beautiful and rugged, outdoor-capable product, built with green materials and green processes.
>
> ***In North America, big ideas like Earthkeepers® and Outdoor Adventure helped to revitalize our brand and spurred positive annual revenue growth in the region for the first time in several years***. Europe continued to produce strong results, ***with men's, women's and kids' revenue up double digits across consumer direct and wholesale channels***. Asia also turned in an impressive performance, with growth in every country, including China, where revenue more than doubled.
>
> 2010 was many years in the making. Our ***strong revenue and earnings growth was built on a resurgence of brand momentum globally***—momentum that was created through a relentless commitment to telling our story.  ***But our journey is not complete. 2010 was one step along Timberland's path to becoming the number one outdoor brand on Earth. And we'll continue to travel that path until we've reached our destination.***

**Jeffrey B. Swartz**

President and Chief Executive Officer

132.     As Sidney Swartz suggested to the Company's Board less than a week later, on March 3, 2011, however, Timberland would be wise to sell to VF, because, in fact, the Company's 2010 performance and cost trends showed the Company was unlikely to reach the forecasts on which the newly increased stock prices had been predicated:

> Mr. J. Swartz discussed his view that because a combination between Timberland and VF would make strategic sense for VF, including in particular the resulting synergies between brands and culture, VF would likely be willing to pay a price higher than $41.00. ***Mr. S. Swartz expressed concern about the difficulty in attaining Timberland's long-term operational plans in light of prior years' results***, uncertainty about the success of key business leaders of Timberland ***and rising costs putting pressure on margins*** . . .

133.     The statements contained in Jeffrey Swartz's February 26th letter were false, misleading and/or misleadingly incomplete because:

(a)     Defendants then knew demand for the Company's products had dramatically declined in key markets, including in North America for its key yellow boot product;

(b)     Defendants then knew the purportedly extraordinary sales growth that they had attributed to sales "momentum" experienced in 4Q 2010, had instead been generated by stuffing the channel; and

(c)     Defendants then knew that the extraordinary earnings growth, rather than being representative and indicative of changed trends, had been accomplished by "deliberately" deferring inventory and advertising expense into 2011 quarters.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Defendants Succeeded in Misleading the Analyst Community, Which Continued to Recommend Timberland to Investors and to Drive Up Timberland's Stock Price**

134.     On March 30, 2011, *CNBC* published a report entitled "Off the Charts," which explained that "Timberland, hit a 52-week high and has gained more than 60 percent. A look at whether investors should step in, with Christopher Svezia, Susquehanna Financial Group analyst." *CNBC*'s March 30th report quoted Svezia as stating: ***"half of Timberland's revenues come from Europe" – "is and has been a very strong environment for the Company" – "product is really beginning to resonate with consumers"*** – in 2010 "Earthkeepers began to take off and explode" – ***"very strong sell-through" – "starting to see strength in core Timberland business" - "footwear business in US has seen a resurgence"*** – ***"we project Q1 Revenues up 14.4%"*** – "operating margin perspective still off peak" – ***backlogs up 19% coming out of year"*** – "ranked with Deckers and #3 and #4 in shoe industry."

135.     On April 13, 2011, Longbow Research's Jonathan Grassi published a report rating Timberland's stock at "Neutral" and placing a price target of $41.82.  Based on Defendants' positive statements, Grassi's report emphasized Timberland's ***"international growth opportunity"*** as one of its strengths that would offset growing supply costs.

136.     Despite increasing evidence available to Defendants showing that their earlier statements had been false and misleading, and that the investment community was continuing to rely upon them to increase the inflation in the Company's stock price, Defendants did nothing to correct the false impression that their earlier comments had created.

137.     Thus, *e.g.*, on April 29, 2011, Susquehanna's Svezia again reiterated his "Positive" rating on Timberland's stock, announcing the Company would release 1Q 2011 results on May 5th and stating, based on his own analysis and Defendants' bullish statements, that Susquehanna now placed a value on Timberland's stock of $45.30 per share.

138.     As the market continued absorbing Defendants' bullish statements and forward guidance, the Company's stock price continued to spiral, reaching a Class Period high of $45 per share by April 29, 2011.

**THE TRUTH EMERGES**

139.    On May 5, 2011, Defendants shocked the market by disclosing Timberland's actual 1Q 2011 financial results (for the quarter ended March 30, 2011) which stood in stark contrast to the rosy picture delivered only weeks earlier, of increased product demand, positive trends, and improvement in structural costs and margins, and which had been supported through Defendants' earnings management:

- Instead of a 25.7% increase in sales over the prior year as achieved in 4Q 2010, in 1Q 2011 worldwide sales grew only 10% over the prior year;

- "Advertising was up 30% in the quarter";

- Due to "strategic purchases of core product" during 1Q 2011, "[i]nventory at quarter end was $186.9 million, *an increase of 36.5%*"; and

- Operating income was "*down 29.2%* compared to operating income" in 1Q 2010.

140.    As a result, where 4Q 2010 profits had *doubled* over the prior year, 1Q 2011 net income actually *declined 30.2% year-over-year to $18 million, or $0.35 per diluted share,* compared with net income of $25.7 million, or $0.47 per diluted share in 1Q 2010.  This occurred in large part because sales revenue reported on the "sell-in" to wholesalers, which would ordinarily have occurred in 1Q 2011, was pulled forward to 4Q 2010, when the Company convinced customers to accept early shipments of products they did not yet need.  Thus, announcement of the 1Q 2011 results disclosed the relevant truth -- that in fact, the reported 2010 results were not indicative of the Company's true trends or demand for its products -- and the Company's stock plummeted on the news.

141.    According to *Bloomberg's* May 5th early morning report, Timberland's stock "fell the most in the Russell 2000, sinking 27 percent to $30.21.  The maker of outdoor clothing and footwear company said it earned 35 cents a share in the first quarter.  That trailed the average analyst estimate of 59 cents in a *Bloomberg* survey."

142.    During the conference call held May 5, 2011, Jeffrey Swartz admitted that, rather than experiencing a strong recovery and sales momentum in the Company's signature "classic boot," sales of the "yellow boots" that had been the staple of Timberland's brand "continue[d] to be a soft

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    business." Instead, Jeffrey Swartz said he was hoping to replace those declining sales with sales of

2    "boat shoes" and other warm-weather wear.  Teffner admitted that ***backlog had shrunk to 16% in***

3    ***the quarter***.  Contrary to the bullish message Defendants delivered on February 17, 2011, Jeffrey

4    Swartz admitted that in January and February, ***demand for Timberland's products in the***

5    ***Company's key U.K. markets simply "wasn't there," emphasizing January in particular "was not***

6    ***too pretty."***

7         143.    Jonathan Grassi of Longbow Research's May 5, 2011 research report blamed

8    "softness in demand for TBL's classic boot products domestically, acceleration in input cost

9    headwinds and increased operating expenses" for the 1Q 2011 miss.  While noting that "[r]evenue

10   growth was one of the strongest in the company's first quarter history increasing 10.1% to $349

11   million (+8.5% in fixed currency)," Grassi explained that "TBL reported a 1Q EPS of $0.35 vs.

12   $0.47 LY, which fell notably below LBR and consensus estimates of $0.59," ***emphasizing "[t]he***

13   ***miss was largely attributable to greater-than-expected SG&A expenses, but also due in part to***

14   ***revenues falling short of expectations and gross margin contraction."*** As a result, Grassi's report

15   provided:

16        FY11 Outlook. We believe TBL has the opportunity to experience robust demand
          driven by EarthKeepers and international markets in 2H11, ***but earnings will be***
17        ***suppressed by challenges on the gross margin line, and higher SG&A spending***
          ***intended to spur demand and support growth internationally***. We look for the
18        company's gross margin to remain under notable pressure in 2H11 as product price
          increases on existing products are only expected to increase in the low single digits.
19        We expect the company's SG&A rate will continue to de-lever into 2Q11, before we
          begin to see investments in marketing pay dividends through increased brand
20        recognition (primarily related to EarthKeepers) and sell-in/sell-through in 2H11, and
          anniversary incremental SG&A spend. We expect the net result will be flattish
21        earnings performance in FY11. •
22

23   Based on his FY 11 Outlook, Grassi explained Longbow was "[a]djusting Estimates. In response to

24   1Q11's miss and higher-than-expected operating expenses we are reducing our FY11 estimate from

25   $2.26 to $1.99."

26        144.    *Bloomberg* would also report that Susquehanna lowered its price target on

27   Timberland from $45 to $38 per share.

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

145.    On this news, Timberland's stock plummeted $11 in a single trading session, or 27%, to close at $30.65, **the biggest decline its stock had experienced in 23 years**, on unusually high volume of more than five million shares trading. **When the dust settled, more than $116 million in market capitalization had simply vanished.**

### CLASS ACTION ALLEGATIONS

146.    This is a class action on behalf of those who purchased or otherwise acquired Timberland common stock between February 17, 2011 and May 4, 2011, inclusive, excluding Defendants (the "Class").  Excluded from the Class are officers and directors of the Company as well as their families and the families of the Defendants.  Class members are so numerous that joinder of them is impracticable.

147.    Common questions of law and fact predominate and include whether Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of Timberland common stock; and (e) the extent of and appropriate measure of damages.

148.    Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

149.    At all relevant times, the market for Timberland's common stock was an efficient market for the following reasons, among others:

(a)    Timberland's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    according to the Company's Form 10-Q filed May 5, 2011, there were over 41 million shares of Timberland common stock outstanding.  During the Class Period, on average, 3/4 of a million shares of Timberland stock were traded on a daily basis, demonstrating a very active and broad market for Timberland stock and permitting a very strong presumption of an efficient market;

1               (c)     Timberland was qualified to file a less comprehensive Form S-3 registration

2 statement with the SEC that is reserved, by definition, to well-established and largely capitalized

3 issuers for whom less scrutiny is required;

4               (d)     as a regulated issuer, Timberland filed periodic public reports with the SEC;

5               (e)     Timberland regularly communicated with public investors *via* established

6 market communication mechanisms, including regular disseminations of press releases on the

7 national circuits of major newswire services, the Internet and other wide-ranging public disclosures,

8 such as communications with the financial press and other similar reporting services;

9               (f)     Timberland was followed by several securities analysts who wrote reports that

10 were distributed to the sales force and certain customers of their respective firms during the Class

11 Period.  Each of these reports was publicly available and entered the public marketplace;

12               (g)     numerous National Association of Securities Dealers ("NASD") member

13 firms were active market-makers in Timberland stock at all times during the Class Period; and

14               (h)     unexpected material news about Timberland was rapidly reflected in and

15 incorporated into the Company's stock price during the Class Period.

16       150.   As a result of the foregoing, the market for Timberland common stock promptly

17 digested current information regarding Timberland from publicly available sources and reflected

18 such information in Timberland's stock price.  Under these circumstances, all purchasers of

19 Timberland common stock during the Class Period suffered similar injury through their purchase of

20 Timberland common stock at artificially inflated prices, and a presumption of reliance applies.

21          **NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS**

22       151.   The statutory safe harbor provided for forward-looking statements under certain

23 circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The

24 specific statements pleaded herein either were not identified as "forward-looking statements" when

25 made or were not accompanied by meaningful cautionary statements identifying important factors

26 that could cause actual results to differ materially from those in the purportedly forward-looking

27 statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-

28 looking statements pleaded herein, Defendants are liable for those false forward-looking statements

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   because at the time each of those forward-looking statements was made, the particular speaker knew

2   that the particular forward-looking statement was false, and/or the forward-looking statement was

3   authorized and/or approved by an executive officer of Timberland who knew that those statements

4   were false when made.

5                                 **LOSS CAUSATION**

6       152.    During the Class Period, as detailed herein, Defendants made false and misleading

7   statements, and omitted material information, concerning Timberland's business fundamentals,

8   revenue and costs trends and engaged in a scheme to deceive the market.  Defendants knowingly

9   managed earnings in support of Timberland's negotiations with VF, first driving up the perception of

10   the Company's past performance and prospects, and then when they realized they had succeeded too

11   well, and Timberland's stock price had become too artificially inflated to support VF's offer,

12   revealing the truth causing the balloon to deflate.

13       153.    By artificially inflating and manipulating Timberland's stock price, Defendants

14   deceived Plaintiff and the Class and caused them losses when the truth was revealed.  When

15   Defendants' prior misrepresentations and fraudulent conduct became apparent to the market on May

16   5, 2011, Timberland's stock price fell precipitously, as the prior artificial inflation came out of the

17   stock price.  As a result of their purchases of Timberland securities during the Class Period, Plaintiff

18   and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities

19   laws.

20                            **FIRST CLAIM FOR RELIEF**

21              **For Violation of Section 10(b) of the Exchange Act**

       **and Rule 10b-5 Against Defendants Timberland, Jeffrey Swartz, Carrie Teffner and**

22                          **Sidney Swartz**

23       154.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

24       155.    Throughout the Class Period, Defendants Timberland, Jeffrey Swartz, Teffner and

25   Sidney Swartz, in pursuit of their scheme and continuous course of conduct to inflate the market

26   price of Timberland common stock, had the ultimate authority for making, and knowingly or

27   recklessly made, materially false or misleading statements or failed to disclose material facts

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    necessary to make the statements made, in light of the circumstances under which they were made,

2    not misleading.

3          156.    During the Class Period, Defendants Timberland, Jeffrey Swartz, Teffner and Sidney

4    Swartz, and each of them, carried out a plan, scheme, and course of conduct using the

5    instrumentalities of interstate commerce and the mails, which was intended to and, throughout the

6    Class Period did: (a) artificially inflate and maintain the market price of Timberland common stock;

7    (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c)

8    cause Plaintiff and other members of the Class to purchase Timberland common stock at inflated

9    prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful

10   scheme, plan and course of conduct, Defendants Timberland, Jeffrey Swartz, Teffner and Sidney

11   Swartz, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange

12   Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary participants in

13   the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

14         157.    In addition to the duties of full disclosure imposed on Defendants Timberland, Jeffrey

15   Swartz, Teffner and Sidney Swartz as a result of their affirmative false and misleading statements to

16   the investing public, these Defendants had a duty to promptly disseminate truthful information with

17   respect to Timberland's operations and performance that would be material to investors in

18   compliance with the integrated disclosure provisions of the SEC, including with respect to the

19   Company's revenue and earnings trends, so that the market price of the Company's securities would

20   be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01,

21   *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

22         158.    Defendants had actual knowledge of the misrepresentations and omissions of material

23   facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and

24   disclose such facts, even though such facts were either known or readily available to them.

25         159.    As a result of the dissemination of the materially false and misleading information

26   and failure to disclose material facts as set forth above, the market price of Timberland common

27   stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price

28   of Timberland common stock was artificially inflated, and relying directly or indirectly on the false

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    and misleading statements made knowingly or with deliberate recklessness by Defendants, or upon

2    the integrity of the market in which the shares traded, Plaintiff and other members of the Class

3    purchased Timberland stock during the Class Period at artificially high prices and, when the truth

4    was revealed, were damaged thereby.

5        160.    Had Plaintiff and the other members of the Class and the marketplace known of the

6    true facts, which were knowingly or recklessly concealed by the Defendants, Plaintiff and the other

7    members of the Class would not have purchased or otherwise acquired their Timberland shares

8    during the Class Period, or if they had acquired such shares during the Class Period, they would not

9    have done so at the artificially inflated prices which they paid.

10       161.    By virtue of the foregoing, Defendants Timberland, Jeffrey Swartz, Teffner, and

11   Sidney Swartz have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

12   17 C.F.R. §240.10-5.

13                          **SECOND CLAIM FOR RELIEF**

14                    **For Violation of §20(a) of the Exchange Act**
                         **Against the Individual Defendants**

15       162.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

16       163.    Defendants Jeffrey Swartz, Sidney Swartz, and Teffner each had control over

17   Timberland and the other Individual Defendants who made the material false and misleading

18   statements and omissions on behalf of Timberland within the meaning of §20(a) of the Exchange Act

19   as alleged herein.  By virtue of their executive positions, board membership, and stock ownership,

20   and their culpable participation, as alleged above, each of the Individual Defendants had the power

21   to influence and control and did, directly or indirectly, influence and control the decision making of

22   the Company, including the content and dissemination of the various statements which Plaintiff

23   contends were false and misleading.  Each of the Individual Defendants was provided with or had

24   unlimited access to the Company's internal reports, press releases, public filings, and other

25   statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued,

26   and had the ability to prevent the issuance of the statements or cause them to be corrected.

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

164.    In particular, Defendants Jeffrey Swartz and Teffner, respectively, had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.  Defendant Sidney Swartz, as Chairman of Timberland's Board of Directors, and through control over the Timberland shares held by the Swartz family trusts, controlled approximately 70% of the Company's voting power and conceded his control over Timberland in the Company's filings with the SEC.

165.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

### THIRD CLAIM FOR RELIEF

**For Violation of Section 20A of the Exchange Act**
**Against Defendant Jeffrey Swartz**

166.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

167.    As indicated below, while Timberland securities traded at artificially inflated and distorted prices, Defendant Jeffrey Swartz personally profited by selling 170,000 shares of Timberland stock for more than $6 million in proceeds on February 17, 2011 while in possession of adverse, material non-public information about Timberland.  On that same day, and in the following days, Plaintiff Omaha Police and other members of the Class traded contemporaneously with Defendant Jeffrey Swartz by purchasing Timberland shares at artificially inflated prices and were damaged thereby:

| SALES | | | | PURCHASES | | | |
|---|---|---|---|---|---|---|---|
| DATE | PRICE | NO. SHARES | TOTAL SALES PROCEEDS | PURCHASE DATE | PRICE | NO. SHARES | TOTAL PURCHASE PRICE |
| 2/17/11 | $34.25 | 1,150 | $39,386 | 2/17/11 | $36.38 | 7,000 | $254,660 |
| 2/17/11 | $34.26 | 28,250 | $980,000 | 2/17/11 | $36.54 | 1,700 | $62,118 |
| 2/17/11 | $35.10 | 2,300 | $80,730 | | | | |
| 2/17/11 | $35.11-$35.51 | 26,273 | $928,000 | | | | |
| 2/17/11 | $35.51 | 580 | $20,595 | | | | |
| 2/17/11 | $35.51-$35.90 | 19,947 | $712,000 | | | | |
| 2/17/11 | $35.92 | 1800 | $64,656 | | | | |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| 2/17/11 | $35.93-$36.30 | 62,198 | $2,246,000 | | | | |
|---|---|---|---|---|---|---|---|
| 2/17/11 | $36.30 | 5,357 | $194,459 | | | | |
| 2/17/11 | $36.31-$36.51 | 22,145 | $806,000 | | | | |

168.    Plaintiff and all the other members of the Class who purchased Timberland stock contemporaneously with the sales of Timberland stock by Defendant Jeffrey Swartz:

(a)    have suffered substantial damages in that they paid artificially inflated prices for Timberland stock as a result of violations of §10(b) of the Exchange Act and Rule 10b-5 herein described; and

(b)    would not have purchased Timberland stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated and/or distorted by Defendants' false and misleading statements.

169.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages.

170.    By reason of the foregoing, Defendant Jeffrey Swartz violated §20A of the Exchange Act and is liable to Plaintiff and the other members of the Class for the substantial damages they suffered in connection with their purchases of Timberland stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.    Determining that this action is a proper class action;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Ordering Defendant Jeffrey Swartz to disgorge his insider trading proceeds, including a constructive trust over those proceeds;

D.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    Awarding such other and further relief as the Court may deem just and proper.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1 | **JURY DEMAND**

2 | Plaintiff demands a trial by jury.

3 | DATED:  January 4, 2012 | SCOTT+SCOTT LLP
WALTER W. NOSS
4 | MARY K. BLASY

5 | /s/ Mary K. Blasy
_____

6 | MARY K. BLASY
707 Broadway, Suite 1000
7 | San Diego, CA  92101
Telephone: 619/233-4565
8 | Email: wnoss@scott-scott.com
        mblasy@scott-scott.com
9 | -and-
DAVID R. SCOTT
10 | AMANDA LAWRENCE
STEPHEN TETI
11 | 156 South Main Street
P.O. Box 192
12 | Colchester, CT  06415
Telephone:  860/537-5537
13 | Email: drscott@scott-scott.com
-and-
14 | BETH KASWAN
500 Fifth Avenue, 40th Floor
15 | New York, NY 10110
Telephone: 212/223-6444
16 | Email: bkaswan@scott-scott.com

17 | *Lead Counsel for Lead Plaintiff*

18 | SHAHEEN & GORDON, P.A.
LUCY J. KARL (N.H. #5547)
19 | 107 Storrs Street
P.O. Box 2703
20 | Concord, NH 03302-2703
Telephone: 603/225-7262
21 | Email: lkarl@shaheengordon.com

22 |

23 | *Liaison Counsel for Plaintiff*

24 |

25 |

26 |

27 |

28 |

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on this 4th day of January, 2012, the foregoing *Amended Complaint for*

3   *Violations of the Federal Securities Laws* was electronically filed via this Court's CM/ECF filing

4   system, which sends notice of filing to all parties registered to receive electronic notice.  All other

5   parties were served a copy via U.S. Mail, postage prepaid.

6                                         SCOTT+SCOTT LLP

7                                         /s/ Mary K. Blasy

8                                         MARY K. BLASY
                                          707 Broadway, Suite 1000
9                                         San Diego, CA  92101
                                          Telephone: 619/233-4565
10                                        Email: mblasy@scott-scott.com

11                                        *Lead Counsel for Lead Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28