UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

City of Omaha Police and Fire
Retirement System, individually
and on behalf of itself and all
others similarly situated,
    Plaintiff

    v.                                          Case No. 11-cv-277-SM
                                                Opinion No. 2013 DNH 044
The Timberland Company,
Jeffrey B. Swartz,
Sidney W. Swartz, and
Carrie W. Teffner,
    Defendants


                         **O R D E R**


        Lead plaintiff, City of Omaha Police and Fire Retirement

System brings this securities class action against The Timberland

Company ("Timberland" or "company"), its chairman, Sidney Swartz,

and two high-ranking officers, CEO Jeffrey Swartz and CFO Carrie

Teffner.  Plaintiff alleges that defendants issued false

statements in violation of the Securities Exchange Act of 1934

and Rule 10b-5 of the securities regulations, and also alleges

control person liability and insider trading.


        Before the court is defendants' motion to dismiss the

complaint for failure to state a claim (doc. no. 29).  For the

reasons given, the motion to dismiss is granted.

**Factual Background**

The following facts come from the complaint[1], from information contained in documents on which the complaint relies, and from publically filed documents.  See Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (in determining the sufficiency of the complaint under Rule 12(b)(6), the court may consider "documents central to plaintiffs' claim [and] . . . documents sufficiently referred to in the complaint.") (quotation omitted).

The Timberland Company manufactures and sells boots and outdoor gear.  Founded by Nathan Swartz, the company's stock began trading publically in 1978.  Members of the Swartz family were controlling shareholders of the company, until 2011, when Timberland was acquired by VF Industries.

Nathan Swartz's son, Sidney, served as the company's CEO and President from 1986 until 1998.  Thereafter he served as Chairman of Timberland's Board of Directors, but continued to be involved in managing the company, receiving a substantial salary in lieu of a director's stipend.  After Sidney stepped down as CEO and President, his son, Jeffrey Swartz, assumed those roles and "ran Timberland as a 'hands-on' manager dealing with important issues

---

[1]   Plaintiff filed its amended complaint (doc. no. 22) after appointment as lead plaintiff.  For simplicity's sake, the amended complaint will be referred to as "the complaint."

. . . including brand development . . . marketing . . . inventory sourcing and management . . . and sales." Am. Complaint, doc. no. 22, at 14. Defendant Carrie W. Teffner joined the company in 2009 as Vice President and Chief Financial Officer. Like Sidney and Jeffrey, Teffner "ran Timberland as a 'hands-on' manager." Id. at 15.

In 2010, Jeffrey Swartz began discussions with VF Enterprises, Inc., regarding the possible sale of Timberland to VF. Sidney Swartz, Jeffrey Swartz, and Teffner stood to gain significantly from such a sale. Nintey-seven percent of the company's Class B common stock was owned by Sidney Swartz and the Swartz family trusts. Jeffrey Swartz was a trust beneficiary, and he owned the remaining Class B shares (about 2.24%). In addition, Jeffrey held in excess of 800,000 shares of the company's Class A common stock, as well as options and warrants entitling him to acquire nearly 1.5 million more shares. As for Teffner, her compensation was "highly weighted toward stock warrants, options and restricted stock units." Id. at 16. Upon sale of the company, Teffner could expect to receive close to $5 million upon immediate vesting and payout of her stock options and restricted stock units, tax reimbursement, and a lump-sum severance. Id.

According to the complaint, Sidney Swartz, Jeffrey Swartz, and Teffner, set about to boost Timberland's stock price in order to obtain a high offer from VF.  Specifically, defendants are alleged to have inflated Timberland's fourth quarter 2010 earnings performance by (1) "recognizing and reporting sales in the 4Q2010 for product that was neither wanted nor needed by retailers until the 1Q2011 (<u>i.e.</u>, 'stuffing the channel')"; (2) deferring advertising expenses into 1Q2011; and (3) not writing off excess inventory in 4Q10.

On February 17, 2011, Timberland issued a press release announcing its financial results for the 4Q10 and the full fiscal year ending December 31, 2010.  The company reported that sales for 4Q10 rose 26.7% over the same quarter the previous year.  In addition, earnings for the fiscal year were reported to have doubled over the prior year, with full-year diluted earnings per share having increased by 89%.

Jeffrey Swartz is quoted in the press release as stating:

1.  The <u>4Q10 "results [were] the culmination of</u> disciplined focus on our operating model and targeted investments in our brand."

2.  "<u>As our progress in the North America business demonstrates</u>, we have the right strategy and the right team in place to grow Timberland to be the number one outdoor brand on Earth."

At the earnings call held on February 17, 2011, Jeffrey
Swartz and Teffner spoke with analysts.  They made the following
statements, among others:

3.  "I am pleased to share with you the <u>real progress</u>
Timberland has made over the last year."  (Swartz)

4.  "With four successive quarters of brand-right growth,
2010 marks the moment when Timberland shifted from playing
defense to playing offense."  (Swartz)

5.  "Turning to trends and strategy in our regions . . . .
I am very pleased, very pleased to report <u>positive momentum</u> from
the Timberland branded business in North America, with revenue up
for 2010 and up double-digits in the fourth quarter."  (Swartz)

6.  "And while North America was <u>returning to profitable
growth</u>, . . ."  (Swartz)

7.  "[W]e are pleased to be able to report <u>real strength and
momentum</u> in our business."  (Teffner)

8.  "We feel strongly that <u>these results show that we can
deliver profitable growth</u> as we build our business to be the
number one outdoor brand on earth."  (Teffner)

9.  "Despite the increase in total inventory, <u>our level of
excess inventory has declined</u> as a percentage of inventory
compared to the fourth quarter of 2009."  (Teffner)

10.  Q: "On inventory, do you feel like . . . you're now
chasing to meet and fill orders just because of the inventory is
only up 13% at this point? Or do you feel pretty confident with
your inventory position right now?"  A: <u>"Yes.  We feel pretty
confident with inventory position right now.</u>  . . .  We do have
some supply issues but certainly not to the level that we
experienced in the back half of 2010.  But we are fine right now
with respect to meeting our orders."  (Teffner)

11.  "[I]nventory up 14%.  That is good, in the context of a
backlog it is up 19% double-digit increases in every one of the
regions . . . . indications are, as we performed at retails, so
we have the right, it is ours to lose, is ours to capitalize on
<u>the momentum that we've created with retailers</u>."  (Swartz)

12.   Q: "You said that you would expect fully to return to 15% operating profit growth.  And I wondered if you had a time line for this now . . .?"  A: "[A] brand that postures to be the number one outdoor brand on earth has to deliver shareholder results as the number one outdoor brand owner kind of results, and <u>15% operating income is exactly the kind of result that we are accountable for</u>.  <u>We are making progress in that direction</u> . . . .  <u>I am not going to back away from that goal.</u>"  (Swartz)

On the same day as the earnings call, the company's stock price rose 30% in a single trading session, closing at $35.93 per share, a 52-week high.  Pursuant to a Rule 10b5-1 trading plan, Jeffrey Swartz sold $6 million of Timberland stock the same day. Swartz had not publically sold Timberland shares "in years."  Am. Complaint, doc. no. 22, at 39.

On February 26, 2011, Timberland issued its fiscal 2010 Annual Financial Report to Shareholders on Form 10-K.  The report contained a letter to shareholders and would-be-investors, signed by Jeffrey Swartz, which stated, among other things:

13.   "2010 marked an important turning point for Timberland . . . 2010 was the culmination of disciplined focus on our business and targeted investments in our brand.  We grew revenue across North America, Europe, and Asia . . . .  We have the right strategy and the right team in place to grow Timberland into the number one outdoor brand on Earth."

14.   "In 2010, our global Classics business <u>returned to growth</u>, and helped to provide a stable foundation for our key growth initiatives."

15.   "In North America, big ideas like Earthkeepers® and Outdoor Adventure helped to revitalize our brand and <u>spurred positive annual revenue growth</u> in the region for the first time in several years.  Europe continued to produce strong results,

with men's women's and kids' revenues up double digits across
consumer direct and wholesale channels."

16.   "Our <u>strong revenue and earnings growth</u> [in 2010] <u>was
built on a resurgence of brand momentum</u> globally – momentum that
was created through a relentless commitment to telling our story.
But our journey is not complete."

17.   "2010 was one step along Timberland's path to becoming
the number one outdoor brand on Earth.   And we'll continue to
travel that path until we've reached our destination."


According to the complaint, at the time of their February 17
and 26 statements, defendants knew, despite their public
comments, that business trends in the 1Q11 (then more than
halfway complete) did not demonstrate "real strength and
momentum," and they also knew that a 15% operating profit growth
was not possible "in the 1Q11 due to weakness in the sales demand
already being experienced, the adverse consequences of the 4Q10
channel stuffing and pulling forward of revenue, and the
increased 1Q advertising and inventory spending then underway."
Pl. Br., doc. no. 30, at 11.   Plaintiffs say that, based on
defendants' rosy public comments, analysts continued to recommend
Timberland to investors and to drive-up the company's stock
price.


On May 5, 2011, defendants "shocked the market by disclosing
Timberland's actual 1Q11 financial results (for the quarter ended
March 30, 2011) which stood in stark contrast to" the picture
"delivered only weeks earlier, of increased product demand,

positive trends, and improvement in structural costs and margins." Am. Complaint, doc. no. 22, at 44. Specifically, the 1Q11 financial results showed a 10% increase in revenues over the same quarter in 2010, which was substantially smaller than the 25.7% increase in sales for the 4Q10, as compared to the fourth quarter 2009. In addition, the 10% year-over-year revenue growth in 1Q11 was tempered by a 30% increase in advertising expenditures and a 36% increase in inventory at quarter's end. As a result, operating income in 1Q11 decreased 29.2% compared to the same quarter in 2010, and net income declined 30.2% to $18 million, compared with net income in 1Q10 of $25.7 million. Whereas 4Q10 profits had doubled over the prior year, the 1Q11 profits declined substantially.

The complaint alleges generally that the alleged decline in 1Q11 occurred "in large part" because sales that would normally have occurred in 1Q11 were pulled forward to 4Q10, thus rendering the 4Q10 financial results not indicative of the company's "true trends or demand for its products." Id.

Investors suffered losses, it is alleged, when, on May 5, 2011, the price of the company's common stock dropped $11 in a single trading session. The 27% drop represented the company's biggest decline in its stock price in 23 years. Id. at 46. On June 3, 2011, Omaha Police, individually, and on behalf of all

persons who purchased Timberland common stock between February 17, 2011, and May 4, 2011 (the "class period"), brought this suit alleging that defendants violated the Securities Exchange Act of 1934 and Rule 10b-5 of the securities regulations.

On June 12, 2011, the company's board of directors accepted VF's offer to purchase the company for $43 per share, an offer that VF had placed on the table in March, before the drastic May 5 decline in the stock's price.  VF's acquisition of Timberland was completed on September 13, 2011.

In count I of its complaint, plaintiff alleges that defendants made false public statements about the company's fourth quarter 2010 performance which "deceiv[ed] the public"; caused Timberland stock prices to become "artificially inflate[d]"; and induced "Plaintiff and other members of the Class to purchase Timberland common stock at [the] inflated prices."  Id. at 47, 49.  In Counts II and III, plaintiff asserts claims for control person liability and insider trading, respectively.  Because Counts II and III are derivative of Count I, they "need[…] no separate discussion."  Smith & Wesson, 669 F.3d 68, 70 n.1 (1st Cir. 2012).

Defendants move to dismiss the complaint in its entirety. Plaintiff objects.

## Standard of Review

When ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must "accept as true all well-pleaded facts set out in the complaint and indulge all reasonable inferences in favor of the pleader." S.E.C. v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010). A complaint will survive a motion to dismiss when it "contain[s] sufficient factual matter . . . to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and internal punctuation omitted).

Moreover, "for plaintiffs asserting claims for securities fraud under the Exchange Act and Rule 10b-5," the PSLRA, 15 U.S.C. § 78u-4(b), "establishes additional strict pleading standards." City of Roseville Employees' Retirement Sys. v. Textron, Inc., 810 F. Supp. 2d 434, 441 (D.R.I. 2011) (Barbadoro, J.) (aff'd Automotive Indus. Pension Tr. Fund v. Textron, Inc., 682 F.3d 34 (1st Cir. 2012)). The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Furthermore, "the PSLRA, requires the complaint to state with particularity facts that give rise to a 'strong inference' of scienter, rather than merely a reasonable inference." In re Cabletron Sys., Inc., 311 F.3d 11, 28 (1st Cir. 2002) (citing 15 U.S.C. § 78u-4(b)(2); Greebel v. FTP Software, Inc., 194 F.3d 185, 196-97 (1st Cir. 1999)). An

inference of scienter is "strong" where it is "'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  In re Boston Scientific Corp. Sec. Litig., 686 F.3d 21, 30 (1st Cir. 2012) (quoting Tellabs Inc. v. Markor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007)).

## Discussion

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j.

Rule 10b-5, promulgated by the SEC pursuant to Section 10(b), provides that "it shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading," in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5 (2010).

The "'basic elements'" of a Rule 10b-5 claim are: (1) a material misrepresentation; (2) scienter; (3) a connection with

the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  In re Stone & Webster, Inc., Secur. Litig., 414 F.3d 187, 193 (1st Cir. 2005) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341 (2005) (emphasis omitted)).  A defendant may be liable under 10b-5 not only for affirmative misstatements, but also for "material omission[s]." Smith & Wesson, 669 F.3d at 74.  "While a company need not reveal every piece of information that affects anything [it] said . . . , it must disclose facts, 'if any, that are needed so that what was revealed . . . would not be so incomplete as to mislead.'"  In re Cabletron, 311 F.3d at 36 (quoting Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (en banc) (quotation marks omitted)).

The PSLRA also establishes a "safe harbor" for certain forward-looking statements.  See 15 U.S.C. § 78u-5.  Pursuant to the safe harbor provision, the maker of a forward-looking statement will not be liable for securities fraud if the statement:

> (1) includes a disclaimer regarding risks and the possibility that results will differ from projections; (2) is immaterial; or (3) the executives of the company had no actual knowledge the statement was false or misleading.  The safe harbor applies both to written and oral statements, such as conference calls and SEC filings.  15 U.S.C. § 78u-5 (c)(2)-(3).

<u>In re Smith & Wesson Holding Corp. Sec. Litig.</u>, 604 F. Supp. 2d
332, 340 (D. Mass. 2009).

Plaintiff here identifies two categories of allegedly
misleading statements that, it says, do not fall within the
PSLRA's safe harbor provision because they are statements of
historic or present fact.  In the first category are the 4Q10
financial figures, which, according to plaintiff, were misleading
because they were "inflated" as a result of channel stuffing
tactics and improper deferral of expenses.  Pl. Br., doc. no. 30
at 25, 26.  The second set of allegedly misleading statements are
those made at the February 17, 2011, earnings call and in the
February 26, 2011, report and letter.  Plaintiff characterizes
them as statements about "then-present" trends or conditions mid-
way through 1Q11.  Plaintiff alleges that these statements of
then-present facts were false or misleading because they were
contrary to certain undisclosed facts known to defendants at the
time, <u>i.e.</u>, "that demand was weakening and that they were
significantly increasing the Company's advertising expenditures
in 1Q11 and had deferred inventory costs from 2010 to 1Q11."  <u>Id.</u>
at 26.[2]

---

[2]    The court addresses only the statements identified and
theories advanced by plaintiff in its brief and at oral argument.
<u>See</u> <u>Friedman v. Rayovac</u>, 295 F. Supp. 2d 957, 984 (W.D. Wis.
2003) ("In their complaint, plaintiffs identify as false or
misleading several other statements made by defendants.  Because
plaintiffs do not discuss these statements in their brief in

Although the complaint alleges fraudulent conduct that goes beyond channel stuffing, the alleged 4Q10 channel stuffing "comprise[s] the central circumstance of Plaintiff['s] fraud claims." In re Spectrum Brands, Inc. Sec. Litig., 461 F. Supp. 2d 1297, 1309 (N.D. Ga. 2006).

I.   4Q10 Financial Results

Plaintiff alleges that the 4Q10 financial results were false because "Defendants inflated Timberland's reported revenues, operating margins, and profits for the 4Q10" for the purpose of "increas[ing] the market price of Timberland stock (and thus the price . . . [VF] would have to pay Defendants for their shares)." According to plaintiff, defendants inflated the financial figures by: (1) "deferring the recognition of expenses in the 4Q10 whose timing Defendants could control, such as for advertising and for product costs included in inventory, that properly should have been written down and/or expensed in 4Q10," and (2) "recognizing and reporting sales in the 4Q10 for product that was neither wanted nor needed by retailers until the 1Q11 (i.e., 'stuffing' the channel)."  Pl. Br., doc. no. 30, at 11.

---

opposition to defendants' motion to dismiss, I conclude that they have conceded that these statements cannot form the basis of liability under the 1934 Act.").

Defendants argue that the complaint fails to allege, with the specificity required by the PSLRA, that the financial results were false.

A.   Improper Deferral of Advertising Expenses

Plaintiff alleges generally that defendants deferred the recognition of advertising expenses in 4Q10 "that properly should have been . . . expensed in" that quarter, thus rendering false or misleading Timberland's statement of its 4Q10 advertising expenses and related financial figures.  Pl. Br., doc. no. 30, pg. 11; Am. Complaint, doc. no. 22, par. 116.

Absent from the complaint, however, are any fact-based allegations to support the general averment.  There are no allegations explaining why the advertising costs should have been recognized in 4Q10.  That is fatal to plaintiff's claim.  See Caprin v. Simon Transp. Servs., Inc., 2004 WL 326995, at *8-9 (10th Cir. 2004) (complaint did not meet PSLRA's pleading requirements where improper deferral of costs was alleged only generally); In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., 398 F. Supp. 2d 244, 253 (S.D.N.Y. 2005) (general allegation that costs were misallocated was insufficient absent factual allegations describing how the misallocation occurred or what improper practices were employed).

15

But even if the complaint had sufficiently alleged improperly deferred advertising expenses, there are no allegations suggesting that the amount of any deferral was material.  Indeed, quantitatively speaking, the deferral appears to be immaterial.  Although the company's advertising expenditures for 1Q11 increased by 30% over the same quarter in FY2010 (an amount which, presumably, represents what should have been expensed in 4Q10), that increase translates into $1.2 million, which is only .24% of Timberland's 4Q10 revenues and 1.9% of that quarter's operating income.  These differences would not likely be material to the reasonable investor.  "'Minor adjustments in a company's gross revenues are not, as a rule, deemed material by either accountants or the securities law.'" S.E.C. v. Patel, 2008 WL 781912, at *8 (D.N.H. March 24, 2008) (holding 1% overstatement of revenue to be immaterial as a matter of law) quoting In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 170 (D. Mass. 2000).  See also Glassman v. Computervision Corp., 90 F.3d 617, 633 (1st Cir. 1996) (omission affecting 3% of revenue not material).

The Court of Appeals for the First Circuit has not adopted a bright line quantitative test for materiality, and courts often look at "qualitative factors" in addition to the cold numbers. See e.g. Ganino v. Citizens Utilities Co., 228 F.3d 154, 163 (2d Cir. 2000).  However, plaintiff here does not point to any

16

qualitative factors that might make what are small quantitative differences material to a reasonable investor.

Accordingly, because the advertising expenses are quantitatively minor, and because plaintiff has not argued for application of a qualitative test, nor pointed to allegations regarding qualitative factors, plaintiff has failed to adequately allege that the purported improper deferral of advertising expenses rendered the reported financial results materially false or misleading.

B.   Failure to Expense Product Costs/Inventory

Plaintiff alleges that, in order to boost its financial results for the 4Q10, Timberland improperly deferred until 1Q11 the recognition of expenses for "product costs included in inventory," that should have been expensed in 4Q10.  Am. Complaint, doc. no. 22, at 3, Pl. Br., doc. no. 30, at 11. Plaintiff points out that the "inventory account on [Timberland's] balance sheet as of December 31, 2010" was up 14% over December 31, 2009, despite the large increase in sales ("sell-ins") for 4Q10.  Am. Complaint, doc. no. 22, at 29.  These circumstances, says plaintiff, signaled defendants' failure to properly write-off inventory costs.  Id.

In support, plaintiff notes that Timberland reported a $30 million "unallocated expense" in 1Q11 (a 15.8% increase) which, by its own admission, was attributable in part to "inventory cost variances and adjustments to standard costs."  Id.  Plaintiff says that fact raises an adequate inference that the large "unallocated expense" was the result of inventory cost deferrals in 4Q10.  Id.

The inference, however, is unsustainable.  The full statement from the 10-Q, not quoted in plaintiff's complaint, says this:

> Our Unallocated Corporate expenses increased 15.8% to
> $30.5 million in the first quarter of 2011.
> Unallocated Corporate expenses include central support
> and administrative costs, as well as supply chain
> costs, including sourcing and logistics, inventory cost
> variances and adjustments to standard costs, which are
> not allocated to our reportable business segments.  The
> increase in costs reflects higher incentive
> compensation costs, incremental costs related to
> business system transformation initiatives, partially
> offset by favorability in our inventory standard cost
> adjustment compared to the adjustment made in the prior
> year period.

1Q11 Form 10-Q, doc. no. 29-9, at 29.  In other words, the standard cost adjustments for inventory taken in 1Q11 were actually favorable (i.e., lower) as compared to the same quarter in the previous year.  In the context of the entire 10-Q statement, the inference on which plaintiff relies disappears. See generally Animal Hospital of Nashua, Inc. v. Antech

Diagnostics, 2012 WL 1801742, at *4 (D.N.H. May 17, 2012) (on
motion to dismiss, "general allegation" may be undermined by
"contradict[ory] . . . specific factual allegations") citing
Carrol v. Xerox Corp., 294 F.3d 231, 243 (1st Cir. 2002).


        In the absence of something more, the fact that the
"inventory account," Am. Complaint, doc. no. 22, at 29, was up
despite stellar sales in the fourth quarter, is not sufficient to
support the general allegation that defendants improperly
deferred inventory cost write-offs in 4Q10.  Because of the "many
subjective judgments [that go into] inventory valuation," the
inference plaintiff presses is merely conjecture.  In re Crocs,
Inc. Securities Litig., 774 F. Supp. 2d 1122, 1143, 1150 (D.
Colo. 2011).  The PSLRA requires more.  See id. (complaint
"fail[ed] to provide specific allegations why such [inventory]
valuation was inaccurate at the time or was based on
inappropriate financial accounting standards").  See also In re
PetSmart, Inc. Secur. Litig., 61 F. Supp. 2d 982, 993 (D. Ariz.
1999) (holding complaint's allegation that "the write-down of
obsolete inventory came too late, rendering every prior financial
statement . . . a misstatement of fact because it overstated
gross profits" insufficient in the absence of "particularized
facts indicating that the timing of the write-down was unusual or
reckless").

C.   Channel Stuffing

Channel stuffing refers to "'inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company.'" Smith & Wesson, 669 F.3d at 75 (quoting Greebel, 194 F.3d at 202).  If distributors later return any "unwanted excess," the practice will have created a "short-term illusion of increased demand" in the period preceding the returns.  Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 598 (7th Cir. 2006), rev. on other grounds, 551 U.S. 308 (2007).  Channel stuffing tactics may include a variety of practices, such as customer discounts, pull-in sales[3], and other incentives.  See e.g. In re Stac Elec. Secur. Litig., 89 F.3d 1399, 1403 (9th Cir. 1996); In re Cypress, 891 F. Supp. at 1380.


Plaintiff here alleges generally that Timberland employed channel stuffing practices in 4Q10 which "inflated" that quarter's revenue figure (and all figures for which revenues are part of the calculation) by "robbing" sales from upcoming quarters, such that the revenue figure did not reflect "true"

---

[3]   "Pull-ins are existing orders shipped in the current quarter rather than in a later quarter as originally scheduled."  In re Cyress Semiconductor Secur. Litig., 891 F. Supp. 1369, 1380 (N.D. Cal. 1995) (aff'd Eisenstadt v. Allen, 1997 WL 211313 (9th Cir. 1997)).  Although, technically, pull-in sales are not a channel stuffing tactic, for simplicity's sake, the court refers to them as such.

demand for Timberland products.  Am. Complaint, doc. no. 22, at 3.  In short, channel stuffing is alleged to have rendered false the 4Q10 financial figures.

When pressed at oral argument, however, counsel for plaintiff conceded that plaintiff does not allege that the so-called channel stuffing tactics facilitated, or were accompanied by, entry of sales into Timberland's books in violation of Generally Accepted Accounting Principles (GAAP) or some other revenue recognition norm.  See Hrg. Tr., doc. no. 43, at 40.  Nor does the complaint allege that the sales were conditional, that rights of return were not properly addressed, or that concessions were granted to customers, by side letters or otherwise, to limit customer risk.[4]  In sum, the complaint does not allege that the revenue figure for fourth quarter 2010 fails to reflect real sales to real customers.

Plaintiff says this is not fatal to its claim.  It argues that, notwithstanding the revenue figure's accuracy under

---

[4]     The closest the complaint comes is the vague statement by CW6 that, "we'd work out some kind of agreement" with customers "to take [product] back" in the event that the product did not sell, and the equally vague statement by CW7 that, for "larger retailers, such as Macy's," Timberland "would take back a line that wasn't doing well."  Id. at 35.  Am. Complaint, doc. no. 22, at 35.  The statements do not specify the terms of the agreements, how they were communicated, the orders affected, nor do they quantify the value involved.

21

generally accepted accounting principles, the figure was
misleading because it was, at least in part, generated through
channel stuffing tactics.  The argument is rejected.


     The court of appeals for this circuit has made clear that
channel stuffing is neither "inherently fraudulent nor always
innocent."  Smith & Wesson, 669 F.3d at 76.  Indeed, it "'might
not even mislead – a seller might have a realistic hope that
stuffing the channel of distribution would incite his
distributors to more vigorous efforts to sell the stuff lest it
pile up in inventory.'"  Id. (quoting Tellabs, Inc. v. Makor
Issues & Rights, Ltd., 513 F.3d 702, 709 (7th Cir. 2008)).  See
also Greebel, 194 F.3d at 202 ("There is nothing inherently
improper in pressing for sales to be made earlier than in the
normal course"); In re Peritus Software Servs., Inc., 52 F. Supp.
2d 211, 222 n.3 (D. Mass. 1999) ("Pull-ins . . . are actual sales
which are treated no differently than any other sale.")
(quotation and citation omitted).


     Claims of fraudulent channel stuffing, therefore, typically
describe sales tactics and other conduct that facilitate improper
revenue recognition, as measured against some recognized
accounting standard, or sales that were otherwise accompanied by
limitations on customer risk, e.g., sales that are not
particularly solid.  See e.g., Aldridge v. A.T. Cross Corp., 284

F.3d 72, 80 (1st Cir. 2002) (contingent sales); <u>Cabletron</u>, 311
F.3d at 25 (fictitious sales).  <u>See also Tellabs</u>, 513 F.3d at 709
(Posner, J.) ("Channel stuffing becomes a form of fraud <u>only</u> when
it is used, as the complaint alleges, to book revenues on the
basis of goods shipped but not really sold because the buyer can
return them.  They are in effect sales on consignment, <u>and such
sales cannot be booked as revenue</u>.") (emphasis added and
quotation omitted).

Although plaintiff here posits, correctly in a strict sense,
that it need not allege a revenue recognition violation under
GAAP, it offers no alternative means by which to test the falsity
of the revenue figure – except to insist that the figure is
misleading because the defendants intended it to mislead.  <u>See</u>
Hrg. Tr., doc. no. 43, at 50-51.  That argument conflates the
false statement and scienter elements.  Nor did plaintiff offer,
even when pressed at oral argument, any well-developed legal
grounds in support of its position.  On this record, therefore,
the court finds that plaintiff has failed to adequately state a
claim that the revenue figure, standing alone and without
reference to defendants' commentary on it, was rendered
misleading simply because it was generated by channel stuffing
tactics.

But that does not end the inquiry.   "[S]trong sales numbers,
however accurate," may, nevertheless, mislead where a company's
"cheerleading commentary" on those numbers "implie[s] . . . that
[the numbers] reflected strong demand, as of the time the sales
were made." Smith & Wesson, 669 F.3d at 74 (emphasis in
original).   And while "[p]urely forward-looking statements that
accompan[y] . . . sales numbers do enjoy considerable protection"
under the safe harbor provisions of the PSLRA, the "implication
. . . that the sales numbers represented market demand at the
time of the sales . . . concern[s] past factual conditions – not
predictions." Id. at 74-75.


In Smith & Wesson, defendants had commented in press
releases and earnings calls that the company's strong financial
results — which had been generated, in part, by pull-in sales and
discounts — demonstrated "progress" and "growth." Id. at 71.
Defendants in that case also stated that the company "continue[s]
to deliver double digit growth." Id. at 72.   The appellate court
found that the strong sales numbers, together with the
"cheerleading" commentary on those numbers, could have implied
the historic fact that sales reflected strong demand at the time
they were made. Id. at 74.


Here, defendants commented that the 4Q10 results reflected
"positive momentum," "real strength and momentum," "momentum that

24

we've created with retailers," and progress toward a 15%
operating margin.  Assuming that such cheerleading commentary
plausibly implied "that the [4Q10] sales numbers represented
market demand at the time of the sales," id., the question is
whether the complaint sufficiently alleges that the implicit
message was false.[5]

    To support a general averment that reported revenue did not
"represent[...] market demand at the time of the sales," Smith &
Wesson, 669 F.3d at 75, a plaintiff must allege specific facts
from which an inference of artificial demand could arise.  See
generally In re Scientific Atlanta, Inc. Secur. Litig., 754 F.
Supp. 2d 1339, 1355 (N.D. Ga. 2010) ("short-term illusion of
increased demand") aff'd 2012 WL 3854795, at *339 (11th Cir.
Sept. 6, 2012).  In re ICN Pharmaceuticals, Inc. Secur. Litig.,
299 F. Supp. 2d 1055, 1062 (C.D. Cal. 2004) ("artificially
increased sales").  Relevant facts include "unusual" sales
tactics and transactions, Smith & Wesson, 669 F.3d at 76; a
decrease in sales in the following quarter, see id.; a build-up
of inventory in distributor channels, see Spectrum Brands, 461 F.
Supp. 2d at 1310; and an inordinate increase in product returns

---

[5]    The implication relates to an historical fact, i.e., actual
demand in 4Q10.  Plaintiff additionally argues that these same
"cheerleading" commentaries carried a second implied message,
i.e., regarding then-current facts ("trends") in 1Q11.  Plaintiff
points to substantially the same set of facts to show the falsity
of both implied messages.  See discussion, infra, at Part II.

in the following quarter, <u>see</u> <u>Cytyc</u>, 2005 WL 3801468, at *17
n.47.  Plaintiff must also provide some details about the
customer transactions affected by the channel stuffing tactics.
<u>Fitzer v. Security Dynamics, Tech., Inc.</u>, 119 F. Supp. 2d 12, 35-
36 (D. Mass. 2000).[6]

   (i) Unusual Sales Tactics or Transactions

   In determining whether or not the sales numbers represented
"market demand" in <u>Smith & Wesson</u>, the appellate court looked at
whether a "significant percentage" of the reported sales in that
case reflected "unusual" discounting or pull-ins.  <u>Smith & Wesson</u>
at 76.  That makes sense, for where pull-ins and discounts are
not unusual (<u>i.e.</u>, where they represent business as usual),
demand, ordinarily, would not be artificial and investors would
not be misled:

> [F]or channel stuffing to be improper logically it must
> be <u>a short-lived scheme</u> in which the wrongdoer attempts
> to capitalize on artificially increased sales before
> the resulting drop in sales.  If channel stuffing
> occurs over time, <u>the pattern of increased sales toward</u>

---

[6]    Even if defendants' <u>silence</u> about their channel stuffing
tactics could be enough to render the financial figures
misleading, to prevail on that theory plaintiff would still have
to allege with particularity that the tactics depressed future
sales, caused excess customer inventory, or prompted increased
returns.  <u>See</u> <u>In re Scientific</u>, 754 F. Supp. 2d at 1355.  In
other words, whether the focus is on defendants' silence or its
"cheerleading commentary," the issue remains the same: has
plaintiff alleged with particularity that the sales tactics in
4Q10 artificially increased demand in that quarter to the
detriment of demand in 1Q11.

<u>the end of each quarter and lower sales at the
beginning of each quarter would be quite transparent to
investors</u>, and thus could not form the basis for an
allegation of fraud.

<u>In re ICN Pharmaceuticals</u>, 299 F. Supp. 2d at 1062.


The complaint here alleges that the strong sales in 4Q10
were unusual, as a whole, given Timberland's seasonal business
cycle.  That fact is relevant, of course, but since "greater
efforts to stimulate" sales in a quarter that is "traditionally
the weakest" is not necessarily "surprising," <u>Smith & Wesson</u>, 669
F.3d at 76, more must be alleged about the unusual nature of the
channel stuffing tactics themselves.


Tactics may be unusual where they "exceed[…] what was
traditional" for the company or where they are not "common in the
[relevant] industry." <u>Smith & Wesson</u>, 669 F.3d at 76.  Plaintiff
here has not alleged that any discounts or pull-ins in 4Q10 were
uncommon in the relevant industry.  In addition, and perhaps more
importantly, the complaint essentially concedes that the sales
tactics used in 4Q10 – which included sales staff incentives,
customer discounts, and pull-ins — were standard practices for
Timberland.


The complaint refers to statements by CW1, a sales planning
analyst, who disclosed that there was a "push by Timberland to

27

reach . . . a Company-wide goal of $100 million in sales" for 4Q10, which included the offer of a free trip to account executives who reached 120% of their sales goals.  Am. Complaint, doc. no. 22, at 29-30.  But, according to CW1, although the company had never before offered a free trip, "a big sales push at the end of quarters was fairly typical at Timberland, as was some sort of incentive to make sales goals."  Id. at 30.

CW1 also stated that "Timberland 'pulled forward' some deals from the next quarter and shipped product in the last quarter of the year [4Q10] that had originally been scheduled to be shipped during the next quarter."  Id.  Although CW1 recounted some detail about the pull-in process used in 4Q10 and noted that there was "unusually strong pressure to hit . . . fourth quarter goals," he also stated that Timberland "'pulled forward' deals 'every quarter.'".[7]  Id.  CW3 likewise confirmed that pull-ins "occurred every quarter," and not just in 4Q10.  Id. at 32.  See In re ICN Pharmaceuticals, 299 F. Supp. 2d at 1062 (dismissing complaint where, among other things, confidential witness's statements showed that channel stuffing was an "ongoing practice").

---

[7]    CW1 does not explain how the "unusually strong pressure" in 4Q10 was manifested.  The allegation, therefore, is vague at best.

With regard to customer discounts, both CW1 and CW6 stated
that "special deals and discounts" were offered "to incentivize
[customers] to make purchases during 4Q2010."  Am. Complaint,
doc. no. 22, at 30, 35.  But CW6 also stated that "Timberland
'always had excess inventory at the end of the quarters'" for
which it "offered discounts to retailers."  Id. at 35.

The CW allegations also do not describe any instance of
channel stuffing occurring with regard to a specific customer.
For instance, CW6's reference to agreements to take back retailer
inventory if the product did not sell is vague for lack of
detail.  No specific customer transactions are described.  See
Fitzer, 119 F. Supp. 2d at 35-36 citing Zeid v. Kimberley, 973 F.
Supp. 910, 923 (N.D. Cal. 1997) (allegations regarding
defendant's liberal return policy did not state a claim for fraud
where no details were offered as to when the transactions took
place, who communicated the return policy to the customers, and
whether any of the products were returned).  The same
deficiencies are found in CW1's statement that Timberland offered
its customers "swaps," whereby the company would take back a
retailer's slower moving products in exchange for an order of
"more popular footwear."  Id. at 30-31.

Moreover, without additional factual detail, there is no
basis from which to infer that the sales resulting from the

alleged 4Q10 channel stuffing tactics represented a "significant percentage" of the total sales for that quarter.  <u>Smith & Wesson</u>, 669 F.3d at 76.  Although a plaintiff is not required to plead with precision the effect of the alleged channel stuffing, <u>Aldridge</u>, 284 F.2d at 81, its general allegation that defendants inflated the company's financial results must be supported by "such basic details as the approximate amount by which revenues and earning were overstated."  <u>Greebel</u>, 194 F.3d at 204.

In <u>Cabletron</u>, the court found the CW statements sufficiently detailed, even though they did not provide "the precise dates of transactions, the names used for phony customers, . . . or the exact dollar amounts of individually fraudulent recorded sales." 311 F.3d at 32.  Instead, CW5 provided other relevant details suggesting that the objectionable practices were widespread, such as, "tractor-trailers in the factory yard, equipment 'borrowed' from employees' desks to be fraudulently processed, and the unusual activity in the warehouse as products were shuffled back and forth."  <u>Id</u>. at 31.  In contrast, the CWs here provide no details – transactional or otherwise – from which to infer even a broad approximation of the amount of sales affected by alleged channel stuffing tactics.  <u>See</u> <u>generally</u> <u>In re Cytyc Corp.</u>, 2005 WL 3801468, at *19 (D. Mass. Mar. 2, 2005) ("[T]he Complaint provides few particulars about the when, where, amount and nature of the transactions of unordered product and the relationship

30

between the amount of unordered product shipped and the company's total revenues."). In short, the complaint, as a whole, does not plausibly allege that there is a substantial likelihood that a reasonable investor would consider the sales efforts in 4Q10 to be important.

(ii) Product Returns and Unusually High Customer Inventories

An inordinate amount of product returns in the quarter following alleged channel stuffing may signal that earlier sales were brought forward to the detriment of future earnings. In re Cytyc Corp., 2005 WL 3801468, at *17 n.47. In Cytyc, the complaint, among other things, did not allege that products sold through channel stuffing tactics had been returned. The court dismissed the complaint, finding "an absence of factual support for the necessary element of falsity or material omissions with respect to the innocuous channel stuffing alleged." Id.

As in Cytyc, the complaint here does not allege an inordinate increase in customer returns in 1Q11, or that customers "had the ability to return products." In re Harley-Davidson, Inc. Secur. Litig., 660 F. Supp. 2d 969, 987 (E.D. Wisc. 2009) (channel stuffing claim dismissed where "unlike other channel stuffing cases cited by parties, there is no claim that Harley was feeding product into distribution channels to boost numbers for a specific reporting period with the possibility that

the product will be sent back soon after; indeed, nothing indicates that dealers had the ability to return products.").

Similarly, a general allegation that channel stuffing tactics "stole" sales from the upcoming quarter is supported when accompanied by a factual allegation that customer inventories were "unusually high." In re Spectrum Brands, 461 F. Supp. 2d at 1310. Here, as is In re Spectrum Brands, no such specific factual allegation has been made. See id. (allegation that customer "stores had multiple weeks of . . . inventory on their shelves" insufficient where complaint failed to further allege that "this level of inventory was unusually high for that time of year").

(iii) Decline in Sales/Demand

Where sales are "artificially inflate[d]" in one quarter as a result of channel stuffing, one may expect a "drop" in sales "in the next quarter as the distributors no longer make orders while they deplete their excess supply." Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1298 (9th Cir. 1998). Plaintiff bases its channel stuffing claim largely on that proposition, alleging generally that the 1Q11 sales were "adversely impacted" by channel stuffing in 4Q10. Pl. Br., doc. no. 30, at 12; Am. Complaint, doc. no. 22, at 3. Plaintiff fails, however, to offer specific factual allegations suggesting that sales in 1Q11 were

materially adversely affected by the sales tactics in the fourth quarter.

One notable problem for plaintiff is the substantial revenue growth Timberland experienced in 1Q11. Compared to the same quarter in 2010, sales of Timberland products did not decline, but instead, increased by 10%. In fact, the 1Q11 year-over-year increase in revenue was the highest since 2005. That is an impressive statistic. Plaintiff attempts, nevertheless, to overcome it. Notwithstanding the positive year-over-year results, plaintiff argues that a decline in demand in 1Q11 is shown by three things: (1) a large difference between revenue growth in 4Q10 and revenue growth in 1Q11, and a 16% year-over-year decline in order backlog; (2) a 36% increase in inventory at the end of 1Q11; and (3) a decline in demand in the U.K. market and softening of "yellow boot" demand in North America.

a.   Revenue and Backlog

Plaintiff posits that the 10% year-over-year increase in 1Q11 sales should not be viewed in isolation, but should be compared to the 25.7% year-over-year increase in 4Q10 sales. When that comparison is made, says plaintiff, the 10% growth in 1Q11 represents a decline in demand linked to the premature sales in 4Q10. See Am. Complaint, doc. no. 22 at 10 ("Instead of a 25.7% increase in sales over the prior year as achieved in

33

4Q2010, in 1Q2011 sales grew only 10% over the prior year.").
That argument is not persuasive, at least on the allegations
pled.

Where a company experiences seasonal fluctuations, "the
appropriate comparison" for financial figures in one quarter is
"not to the numbers from an immediately preceding quarter, but to
those from a comparable date in the preceding fiscal year."
Glassman, 90 F.3d at 633 (citing Capri Optics Profit Sharing v.
Digital Equip. Corp., 950 F.2d 5, 10 (1st Cir. 1991) (in light of
the seasonal nature of business, the alleged "order decline"
should not be measured by comparing orders from "adjoining
quarter[s]," but rather, should be measured on a year-over-year
basis only)).

Timberland is a seasonal company.  Higher sales to
wholesalers typically occur in the third quarter, as retailers
prepare for high retail sales during the fourth quarter's holiday
shopping season.  Am. Complaint, doc. no. 22, at 28.  The first
quarter also typically sees an increase in sales to wholesalers,
as they prepare for upcoming seasons.  Id.  But these seasonal
spikes in Timberland's revenues are not similar to each other in
magnitude, also due to seasonality.  The company's 2010-10K form
states that Timberland's "business is affected by seasonality,"
such that "[h]istorically, revenue in the second half of the year

has exceeded revenue in the first half of the year."  Timberland
2010-10K, doc. no. 29-3, at 19.


    Against this backdrop of seasonal revenue fluctuations, the
complaint comes up short.  No specific facts are alleged to
support the notion that comparing 1Q11's year-over-year revenue
growth rate to that of 4Q10 is an appropriate means to measure a
decrease in demand and/or the approximate magnitude of any
decrease.  And, although plaintiff does not press for a straight
comparison between 4Q10 revenues and 1Q11 revenues, but rather, a
comparison between 4Q10's year-over-year growth rate to 1Q11's
year-over-year growth rate, still, not enough has been alleged or
argued to support the validity of that cross-season comparison.
It is possible, of course, that good reason exists, but plaintiff
simply has not provided it.


    As for the 16% year-over-year decline in order backlog, in
the absence (as noted) of details regarding the alleged 4Q10
channel stuffing tactics, there is no inference of a causal link
between those tactics and the backlog decline.


              b.   Timberland's Inventory Increase in 1Q11

    By the end of 1Q11, Timberland's inventory balance had
increased by nearly 36% over the same quarter in 2010.  At the
February 17, 2011, earnings call, Teffner stated that material

                              35

costs would likely rise in the first half of the year.  Doc. no.
29-4, at 6, 8.  At the 1Q11 earning call in May, 2011, she stated
that the 36% increase in inventory was due to Timberland's
decision to buy leather ahead of anticipated price increases for
that commodity, and in order to position the company to stay
ahead of anticipated demand in the second half of 2011.  Doc. no.
29-8, at 10.

     Notwithstanding those explanations, plaintiff says the
increase was due, in material part, to a decline in customer
demand in 1Q11, a decline created by 4Q10 channel stuffing.  <u>See</u>
Pl. Br., doc. no. 30, at 17 (The "stunning 36.5%" increase in
"the company's inventory balance . . . [is] evidence that the
channel had been stuffed and sales had been pulled forward in
4Q10 resulting in a mismatch between sales and inventory on hand
in 1Q11).  <u>See</u> <u>also</u> Am. Complaint, doc. no. 22, at 29.  But,
given the diverse factors that influence inventory levels, that
general allegation is plainly insufficient under the PSLRA's
heightened pleading standard.  For example, CWs might normally
provide facts suggesting a link between growing inventory levels
and evaporating demand, but none have done so here.  The court
finds, therefore, that the complaint does not adequately allege
that the increase in inventory is explainable in material part
by, or is evidence of, declining demand.

      c.   <u>U.K. Decline and Softening Demand for Yellow Boots</u>
<u>in North America</u>

Plaintiff alleges that Timberland was experiencing a
material decline in demand mid-way through 1Q11 — related to a
decline in demand in the U.K. market, and for Timberland's
classic yellow boot in the U.S.  In 1Q11, revenue growth in
Europe was, overall, up 9%.  In North America it was up 13%.  The
growth in Europe, however, was "partially offset by a decline in
the U.K.," and the growth in North America was realized "despite
the fact that classic boots continue to be, relatively speaking,
soft as part of the mix."  Doc. no. 29-8, at 9.  At the May 5,
2011, earnings call for 1Q11, J. Swartz conceded that "[t]he
classic yellow boot business does continue to be a soft business
for us."  <u>Id</u>.

In the context of overall revenue growth of 10% across all
markets, neither a decline in the U.K. market nor lower demand in
North America for the yellow boot, obviously (or adequately)
suggests a material decline in demand.  As noted, nothing in the
complaint suggests that overall demand in 1Q11 was anything but
impressive.

In the absence of specific allegations to support the
general averment that demand declined in 1Q11, and in light of
the complaint's other deficiencies — that is, the lack of

transactional details regarding 4Q10 sales, and the absence of
specific factual allegations suggesting that 4Q10 sales tactics
and transactions were unusual, and product returns in 1Q11 were
inordinate — the complaint fails to adequately plead an inference
that reported sales figures for 4Q10 did not "represent[] market
demand at the time of the sales." Smith & Wesson, 669 F.3d
at 75.

In summary, the legal impropriety of the alleged channel
stuffing is simply not discernable from allegations in the
complaint. Unlike in a typical channel stuffing claim, the
channel stuffing here is not alleged to have been accompanied by
entry of sales into the company's books in violation of GAAP or
some other revenue recognition norm, or by limitations on
customer risk that render the sales mere contingencies.
Moreover, to the extent defendants' "cheerleading commentaries"
on the 4Q10 financial figures are assumed to have carried an
implied message to the effect that revenue figures represented
real, not artificial, demand, the statements are not adequately
alleged to have been false. Therefore, the complaint fails to
plead with particularity "the reason or reasons why" the 2010
financial statements, alone or in combination with defendants'
cheerleading commentary, were materially misleading. PSLRA, 15
U.S.C. § 78u-4(b)(1).

II.   <u>Then-Current Trends Mid-way Through 1Q11</u>

Plaintiff alleges that Teffner's statement that she was
"pretty confident" about current inventory levels, and
defendants' various statements regarding "strength" and positive
"momentum" with retailers, and progress toward a 15% operating
profit goal, implied false messages about the company's then-
present trends mid-way through 1Q11.  <u>Id</u>.  Pl. Br., doc. no. 30,
at 26.


A.   Teffner's Statements About Inventory Levels

Plaintiff challenges Teffner's statement at the February 17
earnings call that she felt "pretty confident with [Timberland's]
inventory position right now."  Plaintiff argues that Teffner's
statement implied that inventory levels were not excessive in
light of demand, <u>i.e.</u>, "that whatever demand they were seeing or
purportedly had seen in the fourth quarter was continuing into
the first quarter."  Hrg. Tr., doc. no. 43, at 58.


Teffner's comments were made in response to an analyst's
question about inventory, and appear, in context,[8] as follows:

> <u>Analyst</u>: On inventory, do you feel like – it looks
> like you cleaned up a lot of the inventory during the

---

[8]    In ruling on the 12(b)(6) motion, the court may consider the
full earnings call transcript, which the complaint here only
selectively quotes.  <u>See</u> <u>S.E.C. v. Siebel Sys., Inc.</u>, 384 F.
Supp. 2d 694, 699 (S.D.N.Y. 2005).

quarter.  Do you have – do you feel like you're now
chasing to meet and fill orders just because of the
inventory is only up 13% at this point?  Or do you feel
pretty confident with your inventory position right
now?

> Teffner: Yes.  We feel pretty confident with
> inventory position right now.  A lot of it has to do
> with the timing of the order delivery piece.  So we are
> okay.  We do have some supply issues but certainly not
> to the level that we experienced in the back half of
> 2010.  But we are fine right now with respect to
> meeting our orders.

Doc. no. 29-4, at 11.

In context, Teffner's statement that she was "pretty

confident" in Timberland's inventory position does not at all

imply that she was confident that inventory levels were not

excessive – indeed, her message was that inventory levels were

not deficient with respect to meeting demand.  The inference

plaintiff seeks to impose does not arise from Teffner's actual

statements, read in context.

B.    Statements About Strength and Momentum and a 15%
      Operating Profit Goal

Plaintiff challenges statements by J. Swartz and Teffner in

February, 2011, mid-way through 1Q11, that the company was

experiencing "positive momentum," "real strength and momentum,"

and "momentum that we've created with retailers."  Plaintiff also

challenges J. Swartz's statements that a "15% operating income is

exactly the kind of result that we're accountable for"; that

40

"[w]e are making progress in that direction"; and that Swartz was "not going to back away from that goal."

Plaintiff characterizes the statements as "bullish" misrepresentations regarding then-present facts.  It says the statements were false or misleading because they were contrary to certain undisclosed facts known to defendants at the time, i.e., "that demand was weakening and that [defendants] were significantly increasing the Company's advertising expenditures in 1Q11, and had deferred inventory costs from 2010 to 1Q11." Pl. Br., doc. no. 30 at 26.  See also Am. Complaint, doc. no. 22, at 6 ("[B]ased on their decision to increase 1Q 2011 advertising spending and inventory write downs, the Company was not at all 'making progress in [the] direction' of a 15% operating margin growth.").

As an initial matter, it is doubtful that J. Swartz's projections about a 15% operating margin are actionable.  Mr. Swartz's comments were made in response to an analyst's question about the company's operating margin goal, and appear, in context, as follows:

> Analyst: I think Jeff you had said maybe a year or two ago now, that as you are going through your expense management and trying to improve the brand.  You said that you would expect fully to return to 15% operating profit growth.  And I was wondering if you had a time line for this now that we have seen [sic] to have

41

reached an inflection point?  Or do you think it could
possibly go higher than that over the long-term?

     <u>J. Swartz</u>: Well, you are right to remind us of our
accountability to shareholders.  And a brand that
postures to be the number one outdoor brand on earth
has to deliver shareholder results as the number one
outdoor brand owner kind of results, and a 15%
operating income is exactly the kind of result that we
are accountable for.  We are making progress in that
direction.  We're going to continue to fight for that
outcome.  Our LRP, our long-range plan, says that we
will make significant progress against the goal of 15%.
I am not going to back away from the goal, but I don't
want to make silly statements about when.  I would
rather focus on how we are going to get it, and Carrie
outlined that today.  She said the model is very clear,
we have to grow our top line in a profitable brand-
right way.  We have to find every opportunity that we
can to be thoughtful, not on cutting expenses but
running our business smarter.  So, big focus on
Timberland is how we do work.

Feb. 17, 2011, Earnings Call Tr., doc. no. 29-4, at 9.


     Teffner's comments at the February 17 call provide further

context for J. Swartz's statements.  Teffner said:

     We are pleased with our fourth quarter and full-year
results.  <u>As Jeff mentioned, we will have our
challenges in 2011.  We continue to see rising input
costs related to labor, materials and transportation.
We expect such costs will continue to negatively impact
our gross margin</u>.

     .  .  .

     And then as we look at 2011, as I had indicated in the
comments, we will see <u>a drag on gross margin </u>related to
the higher input costs we have.

     .  .  .

     Now what I mentioned in the last call is that we would
be taking price increases, although we would not be

> taking significant price increases in the first half.
> So how we expect this to play out in 2011 is, <u>we will
> see an impact overall on the margin for the full-year.
> It will be bigger in the first half of the year</u> because
> the pricing would not be fully in play, but it would be
> offset in the back half of the year . . . .

<u>Id</u>. at 6, 8 (emphasis added).

In context, J. Swartz's statements about the company's operating margins seem to be entirely forward-looking, vague, and aspirational. Moreover, they seem to have been accompanied by "meaningful cautionary language" from both Swartz and Teffner. But the issue need not be resolved. Even assuming that the statements are not otherwise protected, plaintiff has not alleged with particularity why they were false when made. For the same reason, there is no need to decide if defendants' statements about "strength and momentum" are statements of present fact that fall outside the PSLRA's safe harbor provision. Assuming they are, plaintiff has still failed to allege with particularity why they were false or misleading.

The complaint does not adequately plead that there was a material weakening or decline in demand in 1Q11 that would naturally and demonstrably undermine defendants' optimistic statements. Likewise, the planned advertising expenditures for 1Q11 are not adequately alleged to have been material, or to have led to material misstatements. Finally, as already found, the

complaint fails to adequately allege that defendants improperly deferred inventory cost write-offs from 4Q10 to 1Q11.  In short, the complaint does not allege the existence of facts that were contrary to, or that called into question, defendants' "bullish" statements about trends or conditions in 1Q11.

### Conclusion

Count I is dismissed for failure to "specify . . . the reason or reasons why" defendants' statements were misleading. Counts II and III are necessarily also dismissed because they are derivative of Count I.  See Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 243 (D. Mass. 2001).


The amended complaint, doc. no. 22, is dismissed, albeit without prejudice to plaintiff filing an amended complaint addressing the deficiencies identified, if it can do so both supportably and in good faith.  The plaintiff may file an amended complaint within 30 days of the date of this order or the case will be dismissed.


        **SO ORDERED.**

                              _____
                              Steven J. McAuliffe
                              United States District Judge

March 28, 2013

```
cc:  David A. Anderson, Esq.
     Randall W. Bodner, Esq.
     C. Thomas Brown, Esq.
     Deborah Clark-Weintraub, Esq.
     Christopher G. Green, Esq.
     Lucy J. Karl, Esq.
     Walter W. Noss, Esq.
     Mark B. Rosen, Esq.
     David R. Scott, Esq.
```